# **EXHIBIT A**

# FRANCHISE AGREEMENT

## BETWEEN

## AVF FRANCHISING, LLC

## AND

## Thomas Allen Lynch and Tamara Ann Lynch
("Franchisee")

**EFFECTIVE DATE:** March 18th, 2013

**LOCATION:** Site TBD in Owosso, Michigan

**FRANCHISE TYPE** (Initial Blank Space):

A.     **CONVENTIONAL FURNITURE STORE:** _____ X_____

B.     **CLEARANCE CENTER STORE:**

# AVF FRANCHISING, LLC
## FRANCHISE AGREEMENT

THIS AGREEMENT is made this 18th day of March, 2013, between AVF FRANCHISING, LLC, a Michigan limited liability company ("FRANCHISOR" or "AVF") and Thomas Allen Lynch and Tamara Ann Lynch ("Franchisee" or "You").

## ARTICLE 1 - INTRODUCTION

**1.1    Franchise System.**
FRANCHISOR franchises a system for operation of AVF  stores that will market and sell to the general public home and office furniture, mattresses, flooring, window treatments, electronics, appliances and other related items under the AVF licensed Marks and franchise System ("AVF Products"). Franchisee will operate either a Conventional Furniture Store or a Clearance Center Store , as determined by Appendix C hereto. The typical Conventional Furniture Store franchise will not only offer the complete line of AVF Products, but will contain an in-store clearance center, an in-store Pure Sleep Gallery, and, depending on Store size possible lease space to World of Floors and Paul's TV.  The typical Clearance Center Store will be a stand-alone facility that offers and sells only clearance items that may or may not have been former AVF Products.

Both types of stores will include uniform interior and exterior designs and colors with use of FRANCHISOR's proprietary name and logo.  Franchisee will operate its franchise under uniform and distinctive methods, plans, standards, specifications and systems, as periodically modified by AVF (referred to in this disclosure document as the "AVF  System" or the "Franchise System"). The system may be updated and revised by FRANCHISOR in the future. The franchise operated by you under this Agreement will sometimes be referred to as the "Franchise Business" or the "Store."

**1.2    Franchise Marks.**
FRANCHISOR uses and owns or has rights to certain trademarks, service marks, logos, trade dress and other elements that are used to identify the Franchise System and Store. FRANCHISOR may, in the future, develop, use and register additional or different trademarks, service marks, logos, trade dress and other elements that it may make available for use by Franchisee.   The trademarks, service marks, logos, trade dress and other elements that FRANCHISOR authorizes Franchisee to use now and in the future will be referred to in this Agreement as the "Franchise Marks."

**1.3    Acknowledgements of Franchisee.**
Franchisee recognizes the advantages of operating under the Franchise System and Franchise Marks and desires to obtain the right to operate a Store.

Franchisee acknowledges that it received FRANCHISOR's  Franchise Disclosure Document at least 14 calendar days before signing this Agreement or paying any consideration to FRANCHISOR.  Franchisee acknowledges that it has read and understood this Agreement, the

attachments to this Agreement, and the documents relating to this Agreement, if any, and has been given ample time and opportunity to consult with an attorney or other professional advisor about the potential benefits and risks of entering into this Agreement.

Franchisee understands the risks of being involved in a retail Store business and is able to bear such risks. Franchisee also acknowledges that the success of the Franchise Business depends primarily on Franchisee's efforts. In addition, other factors beyond the control of FRANCHISOR or Franchisee may affect the success of Franchisee's business, including competition, economic conditions, business trends, costs, market conditions, and other conditions that may be difficult to anticipate, assess or even identify.

Franchisee acknowledges that neither FRANCHISOR nor the designated area representative/developer if applicable, nor any of their agents or representatives have made or are authorized to make any oral, written or visual representations or projections of actual or potential sales, earnings, net or gross profits, operational costs or expenses, prospects or chances of success that are not contained in this Agreement, or in FRANCHISOR's Franchise Disclosure Document. Franchisee agrees that it has not relied on and that FRANCHISOR will not be bound by allegations of any representations as to earnings, sales, profits, costs, expenses, prospects or chances of success that are not contained in this Agreement, or in FRANCHISOR's Franchise Disclosure Document. Franchisee understands and acknowledges that the Franchise Business may lose money or fail.

## ARTICLE 2 - GRANT OF FRANCHISE

### 2.1    Grant of Franchise.
FRANCHISOR grants to Franchisee the nonexclusive right to use the Franchise Marks and the Franchise System in connection with the operation of a single Store in accordance with this Agreement and FRANCHISOR's Operations Manual (as defined in Section 8.3). The Franchise Business must be operated at the location designated in Item 1 of Appendix A or at the location designated in accordance with Section 7.1 of this Agreement (the designated location is referred to as the "Franchise Location").

### 2.2    Limitations.
The rights granted to Franchisee in this Agreement relate only to the sale of AVF Products at the Franchise Location, and no exclusive area or other territorial rights are granted to Franchisee, except as specifically provided in Section 2.3 below.

### 2.3    Limited Exclusivity.
Except as otherwise provided in this Agreement, as long as this Agreement is in effect and Franchisee is not in default under this Agreement, FRANCHISOR will not operate or authorize any other person to operate a business using the Franchise Marks or the Franchise System or any other business that offers the same products as a Store in the "Protected Territory" as defined in this Section. Franchisee shall receive a Protected Territory comprised of an area of a seven (7) square mile radius from its Franchised Location. In densely populated urban areas, AVF reserves the right to decrease the Protected Territory based on population and business density that may result in the availability of one or more Stores in a marketing area. In rural areas, AVF reserves the right to increase the geographical area of a Protected Area based on

2

similar considerations those stated below.  Each Territory may or may not include contiguous zip codes, or natural geographic boundaries and territories.  Among the factors AVF will consider when determining the Protected Territory are: trends in population, the number of households, existing and projected competition, average household income, your knowledge of the market, and related factors.  This area will be agreed to by the parties and will be set forth in Item 2 of Appendix A.

FRANCHISOR may operate and authorize others to operate a business or Store that offers the same products as a Store in the Protected Territory if FRANCHISOR acquires a chain of existing retail stores or franchise rights to a chain of existing retail stores; provided that, FRANCHISOR will not add or authorize any other person to add any additional units or Stores in the Protected Territory after the acquisition by FRANCHISOR.

Franchisee's limited rights as stated in this Section relate to location only and do not grant Franchisee any exclusivity of marketing or customers.  All Stores may sell their products and services to any customer. However, you will have no right to solicit or conduct business through the use of toll free telephone numbers, catalogs, direct mail, internet or other advertising or solicitation methods without FRANCHISOR's  prior written approval.

**2.4    Reservation of Rights.**

All rights not expressly granted in this Agreement to Franchisee relating to the Franchise Marks and Franchise System are reserved to FRANCHISOR, including but not limited to: (a) the right to operate and authorize others to operate businesses using the Franchise Marks and/or Franchise System at any location other than a location in the Protected Territory; (b) the right to use or authorize others to use the Franchise Marks and/or Franchise System, or any other trademarks or systems, in connection with the manufacture and sale of products at wholesale or retail, through the use of toll free telephone numbers, catalogs, direct mail, over the Internet or through any distribution channels (including operations within the Protected Territory) other than the operation of a retail Store business operated under the Franchise Marks and Franchise System within the Protected Territory; and (c) the right to operate or authorize others to operate any business that does not use the Franchise Marks or the Franchise System at any location, including locations within the Protected Territory. This includes our right or that of our affiliates to license, franchise or establish a "Mattress World", "Mattress Express", or "Art Van Pure Sleep" or "Pure Sleep" store in your Protected Area.

If FRANCHISOR intends to use the Franchise Marks and/or Franchise System through other distributions channels within the Protected Territory, Franchisee will have the right to participate in those channels of distribution in the Protected Territory in a reasonable manner as determined by FRANCHISOR

## ARTICLE 3 - TERM AND OPTION

**3.1**    **Term.**

This Agreement will begin on the date of this Agreement and continue for ten (10) years from the date of this Agreement unless sooner terminated as provided in this Agreement.

**3.2**    **Option of Franchisee.**

Franchisee will have the option to remain a Franchisee for unlimited periods of ten (10) years each if, at the beginning of each option period, all of the following conditions are fulfilled:

(a)    Franchisee is not in default of this Agreement or any other agreement between the parties and no affiliate of Franchisee is in default under any agreement between the affiliate and FRANCHISOR.

(b)    Franchisee, during the past twelve (12) months, has not received from FRANCHISOR two (2) or more notices of default of the terms of this Agreement or any specification, standard or operating procedure of FRANCHISOR (whether or not such notices related to the same or different violations and whether or not those violations have been remedied by Franchisee).

(c)    Franchisee provides written notice of its intent to continue as a franchisee not more than twelve (12) months and not less than six (6) months before the beginning of the option period.

(d)    Franchisee is able to maintain possession of the Franchise Location and agrees to refurbish the Franchise Location in compliance with the then applicable standards of FRANCHISOR for its type of Store, such standards being reasonably and consistently applied, or Franchisee has been able to secure and develop, in compliance with the then applicable standards of FRANCHISOR used in the granting of a franchise, suitable alternative premises for the Franchise Business.    Any alternative premises must be acceptable to and approved in advance by FRANCHISOR.

(e)    Franchisee, throughout the term of this Agreement, has satisfied all material reporting requirements and all monetary obligations to FRANCHISOR and any affiliates of FRANCHISOR, suppliers and creditors (excepting reasonable disputes that Franchisee is attempting in good faith to resolve) within the amount of time specified for satisfaction or cure of default with respect to such obligation.

(f)    Franchisee has satisfied any additional training requirements for new or existing franchisees of FRANCHISOR.

(g)    Franchisee has signed a general release, in a form specified by FRANCHISOR, of any and all claims against FRANCHISOR, its subsidiaries and affiliates, and their respective officers, directors, agents, members and employees.

4

(h)　　Franchisee has signed and delivered to FRANCHISOR, within thirty (30) days of receipt from FRANCHISOR, the then-current standard franchise agreement in use by FRANCHISOR at the time of Franchisee's notice to FRANCHISOR together with such other documents as are then customarily used by FRANCHISOR to grant new franchises, all of which will replace this Agreement. The new standard franchise agreement signed by Franchisee may have substantial differences from this Agreement, including, without limitation, different or increased fees.

(i)　　Franchisee must pay a renewal fee to exercise its option. The renewal fee will be equal to 25% of the initial franchise fee being charged by FRANCHISOR at the time of renewal. This fee must be paid at the time the new standard franchise agreement is delivered to FRANCHISOR.

(j)　　FRANCHISOR has approved the renewal of the franchise. If all of the other conditions in this Section are met, FRANCHISOR will not withhold approval of renewal except for good cause.

Failure or refusal by Franchisee to sign the franchise agreement and other documents and pay the renewal fee within thirty (30) days after delivery of the franchise agreement and other documents, when FRANCHISOR approves renewal of the franchise, will be deemed an election by Franchisee not to renew the franchise. If Franchisee does not elect to renew its franchise relationship, does not qualify for renewal or does not comply with the requirements for renewal specified above, the franchise relationship between FRANCHISOR and Franchisee will automatically terminate on completion of the term set forth in this Agreement.

## ARTICLE 4 - FEES, REPORTS, ACCESS AND AUDIT

**4.1　Initial Franchise Fee.**
Franchisee purchasing an Individual Unit must pay an initial franchise fee in the amount of $50,000.

**Initial Franchise Fee Debt Forgiveness**

At the sole option of AVF, conversion franchisees may be offered the opportunity to pay the initial franchise fee to AVF through execution of a forgivable five (5) year promissory note in the amount of $50,000, including interest at the federal prime rate plus 2% (the "Franchise Fee Debt"). A copy of the promissory note is set forth as Appendix D-1 to this Agreement. The Franchise Fee Debt and applicable interest will then be forgiven or reduced at the rate of twenty per cent (20%) per year provided that Franchisee complies with the following criteria: (i) proof of build out or remodeling expenditures pursuant to AVF standards and criteria in the minimum amount of $50,000 is provided to AVF; (ii) Franchisee has remained current in all obligations owing under the Franchise Agreement; (iii) Franchisee has completed grand opening within 90 days of conversion; and (iv) Franchisee has attended all annual conventions. The Note provides that if these conditions are not met, the balance of the initial franchise fee less credits earned will be due to AVF.

AVF   If this Agreement is being signed by Franchisee to comply with an Area Development Agreement, the Franchisee will receive a credit of $10,000 against the initial franchise fee owing under this Agreement. All initial franchise fees are payable in full at the time of signing of this Agreement. The initial franchise fee is considered earned at the time of signing of this Agreement and is not refundable.

**4.2    Royalty.**

Franchisee must pay FRANCHISOR a weekly royalty of 5% on all Gross Sales, which must be reported and paid, in the manner specified in Section 4.8 below, on or before Wednesday of each week based on Gross Sales for the preceding week. Royalty fees are not refundable.

For purposes of this Agreement, "Gross Sales" means the entire amount of all of Franchisee's revenues from the ownership or operation of the Franchise Business including the proceeds of any business interruption insurance, whether the revenues are evidenced by cash, credit, checks, gift certificates, coupons and premiums (unless exempted by FRANCHISOR), services, property or other means of exchange, excepting only the amount of any sales taxes that are collected and paid to the taxing authority. Cash refunded and credit given to customers and receivables uncollectible from customers will be deducted in computing Gross Sales if the cash, credit or receivables represent amounts previously included in Gross Sales were royalty fees and advertising contributions previously paid. Gross Sales are deemed received by the Franchisee at the time the goods, products, merchandise, or services from which they derive are delivered or rendered or at the time the relevant sale takes place, whichever occurs first. Gross Sales consisting of property or services (for example, "bartering" or "trade outs") are valued at the prices applicable to the products or services exchanged for the Gross Sales at the time the Gross Sales are received.

**4.3    Grand Opening Advertising; National Marketing Fund Contributions; Local Area Advertising Program.**

Franchisee must spend not less than $10,000, to be used for grand opening advertising for the Franchise Business in accordance with Section 9.1 of this Agreement. The specified amount must be paid to vendors at least 60 days before the earlier of: (a) the actual date of opening of the Franchise Business; or (b) the designated opening date of the Franchise Business.

Franchisee shall also pay an amount equal to 1% of Franchisee's Gross Sales to an advertising fund that will be administered by Franchisor or an agency Franchisor designate. See Section 9.2. Franchisee must also spend each month for local advertising an amount that is not less than 3% of Gross Sales.

**4.4    Training Fees.**

Training fees are not charged by FRANCHISOR for the initial training program (see Section 10.1). Additional training requested by Franchisee will be solely at Franchisee's expense. That expense will include reimbursement for the costs of materials, travel (if any), and a reasonable per diem charge to cover FRANCHISOR's personnel costs. Also, FRANCHISOR may require Franchisee to attend additional training at Franchisee's expense.

FRANCHISOR provides and pays for the instructors, training facilities, and training materials utilized in training for the first two persons designated by Franchisee to attend the initial

training program. Franchisee must pay the training fees periodically establish for any other persons to attend the initial training program or any subsequent training program. These fees may be announced through bulletins, manuals or other written notices, but they shall not be less than $2,500 for 40 hours of training plus $100 for training materials for each additional person to attend training. If Franchisee requires additional on-site business coaching and assistance beyond that provided under this Agreement, the cost will be as charged in the manual, bulletins or written notices (which may be revised from time to time), which at the time of this Agreement is $300.

**4.5     Renewal Fee.**

Franchisee must pay a renewal fee if Franchisee elects to renew its franchise at the end of the initial term of the franchise. The renewal fee is 25% of the initial fee payable at the time of the renewal. See Section 3.2(i).

**4.6     Transfer Fee.**

A transfer fee is payable on a transfer of the Franchise Business. The transfer fee is $10,000 plus any broker fees charged. See Section 13.2(f).

**4.7     Late Charge; NSF Fees; Interest.**

Franchisee must pay to FRANCHISOR, on demand, a late charge of $100 for any payments not made to FRANCHISOR within five days of the due date of the payment. In addition, Franchisee must pay on demand a fee equal to any charges FRANCHISOR may incur as a result of checks or debits returned to FRANCHISOR for non-sufficient funds or other similar reasons ("NSF fees"), but not less than $30.00 for each item returned. Also, Franchisee must pay to FRANCHISOR, on demand, interest on all overdue payments from the date the payment was due until paid equal to the lesser of: (i) the prime federal rate plus 3% per month or (ii) the maximum rate of interest permitted by law. The assessment of late charges, NSF fees and interest will not be the sole remedies of FRANCHISOR in such circumstances.

**4.8     Manner of Payment.**

Franchisee must pay royalty and National Marketing Fund contributions and any other periodic payments to FRANCHISOR by electronic or similar funds transfer in the appropriate amounts from Franchisee's primary operating bank account to such accounts, and at such places or in such manner as FRANCHISOR may specify from time to time. Franchisee's primary operating bank account means the account in which all revenue of the Franchise Business is deposited and held to pay amounts owed to AVF and other creditors of the Franchise Business. Franchisee must sign and deliver to its bank and to FRANCHISOR those documents necessary to authorize and effectuate the transfers as specified by FRANCHISOR. Franchisee must not terminate this authorization as long as this Agreement is in effect. Franchisee must not close its primary operating bank account without prior written notice to FRANCHISOR and the establishment of a substitute primary operating bank account for the transfers. Franchisee represents and warrants to FRANCHISOR that it will have sufficient funds in its primary operating bank account from time to time to cover payment of all amounts due to FRANCHISOR on a timely basis.

7

**4.9    No Setoff; Application of Payments.**

Franchisee's obligations for the full and timely payment of the fees described in this Agreement are absolute and unconditional. Franchisee must not delay or withhold the payment of all or part of those fees based on the alleged nonperformance by FRANCHISOR or for any other reason or put the fees in escrow or setoff against any claims Franchisee may allege against FRANCHISOR. FRANCHISOR may apply any payments received first to any accrued late charges or interest and then to any delinquent fees or other amounts outstanding before crediting the payment in the manner specified by Franchisee or to the current amount due.

**4.10    Reports and Financial Statements.**

Franchisee must use the standard reporting system and forms specified by FRANCHISOR. Franchisee must submit to FRANCHISOR a complete statement of Gross Sales and other information specified by FRANCHISOR for the reporting periods and on the forms specified by FRANCHISOR. Franchisee must provide FRANCHISOR with copies of all sales or similar tax returns, annual income tax returns, monthly profit and loss statements, monthly balance sheets, monthly inventory statements and annual financial statements. Copies of monthly statements or reports must be provided within 30 days of the end of each month and copies of annual statements or reports must be provided within 120 days of the end of Franchisee's fiscal year. FRANCHISOR may specify other requirements relating to reporting in the Operations Manual.

FRANCHISOR may receive information directly from suppliers and Franchisee authorizes Franchisee's suppliers to provide information directly to FRANCHISOR. Franchisee agrees to sign separate authorizations or additional documents requested by suppliers or deemed necessary by FRANCHISOR to obtain information directly from suppliers.

The financial records of Franchisee may be disclosed by FRANCHISOR in future Franchise Disclosure Documents without specifically identifying the individual Store for which a particular franchisee's financial records relate, and to FRANCHISOR's actual and potential lenders.

**4.11    Point of Sale and Computer Equipment and Software; Access to and Use of Information.**

Franchisee must at all times use FRANCHISOR's proprietary accounting software system. If Franchisee is a conversion franchisee, such transition must occur no later than 60 days from beginning operation as an AVF Franchisee. Franchisee must also purchase a point of sale ("POS") system for use in the Franchise Business. The POS system will be a network of registers, computers, software, phones and wiring system. The number of components necessary will depend on the size of the Store, but will include POS terminals, printers, bar code scanners, cash drawers, credit card readers, routers, an uninterruptible power supply, bar code label printers, printer/copier/fax/scanner, back office computers, POS programming, POS software licensing and terminal services. Franchisee must also pay all support, maintenance, update and upgrade costs to maintain the specified POS and computer systems in the manner specified by FRANCHISOR. FRANCHISOR may develop, acquire, update or modify a POS and computer system and specifications for certain components of the POS and computer systems in the future. As part of the POS and computer systems, FRANCHISOR may require Franchisee to obtain specified computer hardware and software including, without limitation, a license to use proprietary

software developed by us or others and service agreements. Modification of the specifications for the components of the POS and computer systems may require you to incur costs to purchase, lease or license new or modified computer hardware and software and to obtain service and support for the POS and computer system during the term of this Agreement. Within 90 days after you receive notice from FRANCHISOR, Franchisee must obtain and have operational the components of the POS and computer system that AVF specifies.

Franchisor shall have the right to independently access the sales information and other data produced by the POS, accounting system and other computer systems, but AVF will not access information unrelated to your franchise. Franchisee must provide us access to the information on the POS and computer systems in the manner specified by us and must supply FRANCHISOR with any security codes necessary to obtain that access. FRANCHISOR may retrieve, analyze, download and use the software and all data on your POS and computer systems at any reasonable times as long as the access does not unreasonably interfere with the operation of the Franchise Business.

The required computer hardware and software will also collect and make available to Franchisee and FRANCHISOR information about the Franchise Business, including purchases, customer data, inventory, receipts, cost of goods, profitability and expenses.   Unless otherwise required by law, FRANCHISOR will not provide the information to any other person except in summary or statistical formats with identifying information removed.

FRANCHISOR has no obligation to provide support for required hardware or software programs that are purchased from or that are supplied by third-party vendors. FRANCHISOR has no contract with any hardware manufacturer to provide Franchisee with service or support, and does not represent that it has knowledge as to the cost of updates and upgrades. There is no limit to the frequency with which Franchisee may require them or the amount of the cost. Those factors are determined by computer hardware and software manufacturer pricing and service policies.

**4.12    Records.**
Franchisee must keep complete and correct books of account, business records and records of Gross Sales, in accordance with the procedures specified by FRANCHISOR and in accordance with generally accepted accounting principles. Franchisee must keep all of its business records for a minimum of seven (7) years.

**4.13    Inspection by FRANCHISOR.**
To determine whether Franchisee is complying with this Agreement, and/or to determine whether Franchisee is complying with all applicable specifications and quality standards in connection with Franchisee's use of the Franchise Marks and Franchise System, FRANCHISOR or its designated representatives have the right, at any reasonable time and without prior notice, to: (a) inspect the Franchise Business; (b) confer with Franchisee and its employees; and (c) inspect equipment, signage, fixtures, furniture, inventory, products and operating methods of Franchisee. FRANCHISOR may require that Franchisee furnish its customers with an evaluation form specified by FRANCHISOR pre-addressed to FRANCHISOR. Also, FRANCHISOR may require that Franchisee maintain a comment box at the Franchise Location, which may only be opened by

FRANCHISOR. Franchisee must fully cooperate with representatives of FRANCHISOR making any inspection or observing the work of Franchisee or its employees or retrieving information from the comment box.

## 4.14    Access to Records and Audit by FRANCHISOR.

FRANCHISOR or its designated representatives have the right at all reasonable times to examine and copy the books, records and tax returns of Franchisee. FRANCHISOR will also have the right, on five days written notice, to have an audit made of the books of Franchisee. If an audit reveals that any payments to FRANCHISOR have been understated in any report to FRANCHISOR, Franchisee must immediately pay to FRANCHISOR the amount understated on demand, in addition to interest at the prime federal rate plus 3% and late charges required under Section 4.7 of this Agreement, from the date originally due to the date paid.

Any audit will be conducted at the expense of FRANCHISOR. However,, if an audit is made necessary by Franchisee's failure to furnish reports, financial statements, or tax returns, or discloses an understatement of 2% or more of the Gross Sales of the Franchise Business in any report, then FRANCHISOR has the right to charge Franchisee for the costs of the audit, including, without limitation, any travel expenses, meals, lodging and compensation of FRANCHISOR's employees or agents and reasonable accounting and attorney's fees.

Nothing contained in this Section constitutes FRANCHISOR's agreement to accept any payments after they are due or a commitment by FRANCHISOR to extend credit to or otherwise finance Franchisee's operation of the Franchise Business. The payment of FRANCHISOR's expenses and/or the assessment of late charges or interest are not the sole remedies of FRANCHISOR in those circumstances and this Agreement may be subject to termination under Article 14.

## 4.15    Initial Investment and Inventory Financing.

If in FRANCHISOR'S sole opinion Franchisee is financially creditworthy, FRANCHISOR may, at its discretion, offer two (2) types of financing to Franchisee: (a) financing of up to 50% (but not more than $200,000) of the initial investment costs excluding operating costs ("Initial Investment Financing"), and (b) stock inventory financing ("Inventory Financing"). If financing is offered, Franchisee must execute standard promissory notes (Appendix D-2 and D-3) and a standard security agreement in the form of Appendix E with respect to either or both types of financing, as applicable. Terms of payment with respect to Initial Investment Financing shall be monthly over a period of thirty six (36) months plus interest at the federal prime rate plus 2%. With respect to Inventory Financing, FRANCHISOR shall have the sole right to determine the maximum amount it will finance. Interest at the federal prime rate plus 2% will also be charged on any unpaid principal.

## 4.16  Product Delivery Fees

In the event Franchisee's Store is located within Franchisor's distribution center delivery area, Franchisor may offer to Franchisee the option for Franchisor or its representative to deliver Products to Franchisee's customers for a fee that will be dependent on the price of gas, labor and other operational expenses.

## ARTICLE 5 - SERVICES PROVIDED TO FRANCHISEE

**5.1**    **Site Selection and Lease Negotiation.**
FRANCHISOR will provide Franchisee with site selection criteria for the location of the Franchise Business.  If requested, FRANCHISOR will review your proposed location.

**5.2**    **Construction and Improvements.**
FRANCHISOR will assist Franchisee in the process of construction or improvement of the Franchise Location by specifying the standard format for the construction or improvement of the Franchise Location.

**5.3**    **Equipment, Fixtures, Signs, Inventory and Suppliers.**
FRANCHISOR will specify and provide sources of supply for the equipment, fixtures, signs and AVF   Product inventory necessary for Franchisee to develop and begin operation of the Franchise Business.

**5.4**    **Operations Manual; Update Specifications.**
FRANCHISOR will loan to Franchisee one copy of its Operations Manual for use in the operation of the Franchise Business.  FRANCHISOR will provide any updates to Franchisee of the Operations Manual and of FRANCHISOR's specifications for all aspects of the Franchise Business as they become available. The Manual may not be duplicated in any manner.

**5.5**    **Training.**
FRANCHISOR will provide an initial program to train Franchisee to operate the Franchise Business, as well as ongoing training programs from time to time.  See Section 10.

**5.6**    **Computer Equipment and Software:**
Provide sources to Franchisee for lease or purchase computer equipment, software and backup support from third party vendors to generate customer invoices, accounts receivable reports and other management reports.

**5.7**    **Products and Services; Suppliers; Warranties.**
FRANCHISOR will designate the AVF Products and services to be offered by the Franchise Business and will provide Franchisee with any updates in FRANCHISOR's specifications for the products or services to be offered by the Franchise Business.  FRANCHISOR will provide sources of supply for all authorized products and services.  Any warranties with respect to any products sold by Franchisee, including AVF Products, will only be those provided by the manufacturer of such products

11

**5.8    Operational Assistance.**

A representative of FRANCHISOR will visit the Franchise Business after opening and will periodically visit the Franchise Business after that at such intervals deemed appropriate by FRANCHISOR throughout the remaining term of this Agreement. Upon your request and depending upon availability of our staff, FRANCHISOR will provide a member of its staff to provide on-site advice and consultation in connection with the operation othe franchise. If FRANCHISOR is requested or required to make numerous visits to Franchisee in a 12 month period, Franchisee may be required to reimburse FRANCHISOR for the reasonable travel and lodging expenses it incurs. During these visits, the representative will evaluate Franchisee's operations and provide any operational advice and assistance deemed necessary by the representative. FRANCHISOR will also provide reasonable operational advice and assistance to Franchisee by telephone or email, including advice on specific services or products, if requested by Franchisee.

**5.9    Pricing.**

FRANCHISOR will provide guidance on the pricing of the products and services of the Franchise Business.

**5.10    Advertising.**

When implemented, FRANCHISOR will administer the National Marketing Fund and review for approval, any local advertising proposed by Franchisee. See Article 9. FRANCHISOR shall provide such merchandising, marketing and other data and advice as may be developed by FRANCHISOR and deemed by it to be helpful in the operation of the Franchised Business

**5.11    Indemnification for Trademark Actions.**

FRANCHISOR will indemnify Franchisee for certain liabilities arising from use of the Franchise Marks as provided in Section 6.4.

**5.12    FRANCHISOR's Services May be Provided by Independent Agents and Representatives.**

The services to be provided by FRANCHISOR under this Agreement may be provided by employees of FRANCHISOR or by independent representatives and agents engaged by FRANCHISOR, including but not limited to the Area Representative (or its employees or agents) for the area in which the Franchise Business is located, if any.

**5.13    Consultation:**  Business consultation and advice, will generally be conducted by telephone support. Upon request and depending upon availability of AVF staff, AVF will provide a member of its staff to provide Franchisee on-site advice and consultation in connection with the operation of its AVF franchise. If Franchisee chooses this option, it will be required to reimburse AVF for the then-current per diem listed in the Operations Manual(which is currently $300/day) plus travel, meals and lodging expenses we incur. This consultation will include access and availability to a help/support desk that will be operated Monday through Friday from 9-5 Monday through Friday, eastern standard time.

**5.14    Reporting System:**  Franchisor shall provide an approved Gross Sales reporting system, including one copy (in hard copy or electronic form) of certain materials and forms to be used in connection therewith (collectively, the "Reporting System").

**5.15    Opening Assistance**: Plan and develop opening advertising, promotional and marketing programs

**5.16    Bulletins:**  Franchisor shall provide such bulletins, brochures and reports as may be published by Franchisor regarding its plans, policies, research, developments and activities for the System.

## ARTICLE 6 - USE AND PROTECTION OF FRANCHISE MARKS

**6.1    Non-ownership of Franchise Marks.**
Nothing in this Agreement gives Franchisee any right, title or interest in or to any of the Franchise Marks or any goodwill in and to the Franchise Marks, except a mere privilege and license during the term of this Agreement, to display and use the Franchise Marks according to the terms and conditions of this Agreement.

**6.2    Use of Franchise Marks.**
Franchisee must use the Franchise Marks only in connection with the operation of the Franchise Business pursuant to the Franchise System and only in the manner specified in this Agreement, the Operations Manual or otherwise by FRANCHISOR. The Franchise Business must be operated under the Franchise Marks and under no other name or mark. Franchisee must not use the Franchise Marks in connection with any products or services not specifically authorized by FRANCHISOR in writing or in connection with any products or services that are not produced in accordance with the quality, uniformity and other standards established by FRANCHISOR in and through the Franchise System. FRANCHISOR will have the right at any time to examine the products and services offered by Franchisee, at the Franchise Location, to determine compliance with the applicable FRANCHISOR standards. If at any time FRANCHISOR becomes aware that the products or services provided by Franchisee fail to conform to those standards, FRANCHISOR will notify Franchisee. On such notification by FRANCHISOR, Franchisee must promptly cease to use the Franchise Marks on products that are non-conforming and must not sell any further non-conforming products or services until the standards are met to the satisfaction of FRANCHISOR.

Franchisee must not reproduce or cause to be reproduced any Franchise Marks in any manner, including reproduction on forms or invoices, in connection with advertising, marketing or promotion, or on the Internet or in an Internet domain name, without the prior written approval of FRANCHISOR. Franchisee must not use the Franchise Marks in its business, corporate, partnership or limited liability company name. Franchisee must register to do business under the assumed business name of "AVF ™" with an additional number or designation as determined by FRANCHISOR to distinguish the assumed name from other Stores (for example: "AVF of Troy").

On expiration or termination of this Agreement, FRANCHISOR may, if Franchisee does not do so, sign in Franchisee's name and on Franchisee's behalf, any documents necessary in FRANCHISOR's judgment to end and cause discontinuance of Franchisee's use of the Franchise

Marks and FRANCHISOR is irrevocably appointed and designated as Franchisee's attorney-in-fact for that purpose.

### 6.3    Use of Other Trademarks.

Franchisee must not display the trademark, service mark, trade name, insignia or logotype of any other person, firm or corporation in connection with the operation of the Franchise Business without the prior written consent of FRANCHISOR, which may be withheld in FRANCHISOR's sole subjective discretion.

### 6.4    Defense of Franchise Marks.

If Franchisee receives notice, or is informed, of any claim, suit or demand by a third party against Franchisee on account of any alleged infringement, unfair competition, or similar matter relating to Franchisee's use of the Franchise Marks, Franchisee must promptly notify FRANCHISOR of the claim, suit or demand. FRANCHISOR will then take such action as FRANCHISOR deems necessary and appropriate to protect and defend Franchisee against the claim, suit or demand. Franchisee must not settle or compromise any such claim by a third party without the prior written consent of FRANCHISOR. FRANCHISOR will have the sole right to defend, compromise or settle any such claim, in its discretion, using attorneys of its choosing, and Franchisee agrees to cooperate fully with FRANCHISOR in connection with the defense of any such claim. Franchisee may participate at its own expense in such defense or settlement, but FRANCHISOR's decisions with regard to the Franchise Marks will be final.

FRANCHISOR will indemnify Franchisee against liability to third parties resulting from claims by third parties that Franchisee's use of the Franchise Marks infringes trademark rights of the third party, but only if (a) Franchisee has used the Franchise Marks in accordance with the requirements of this Agreement, the Operations Manual and FRANCHISOR's specifications and (b) Franchisee has given notice to FRANCHISOR of the claim within 10 days of receipt by Franchisee of the claim and Franchisee has tendered the defense of the claim to FRANCHISOR.

### 6.5    Prosecution of Infringers.

If Franchisee receives notice or is informed or learns that any third party, who Franchisee believes is unauthorized to use the Franchise Marks, is using the Franchise Marks or any name or mark confusingly similar to the Franchise Marks, Franchisee must promptly notify FRANCHISOR of the facts relating to such alleged infringing use. FRANCHISOR will then, in its sole discretion, determine whether or not it wishes to take any action against such third person on account of such alleged infringement of the Franchise Marks. Franchisee will have no right to make any demand against any such alleged infringer or to prosecute any claim of any kind or nature whatsoever against such alleged infringer for or on account of such infringement. If FRANCHISOR chooses to prosecute any violation of the Franchise Marks, Franchisee must sign all documents and do all acts necessary or incidental to that action as counsel for FRANCHISOR may reasonably request. Any damages awarded or recovered in any prosecution of an infringement claim related to the Franchise Marks will be the exclusive property of FRANCHISOR.

### 6.6    Modification or Substitution of Franchise Marks.

FRANCHISOR may change the authorization to use the Franchise Marks contained in this Agreement, including adding, discontinuing or modifying Franchise Marks, or substituting different

14

Franchise Marks, by issuing, in the form of an Addendum, a description of the changes and the products or services to which they relate. Franchisee is required to use and abide by these changes or substitutions at its sole expense. FRANCHISOR may make the changes because of the rejection of any pending registrations or the revocation of any existing registrations of or rights to the Franchise Marks, or due to the rights of senior users, or for other business reasons, except FRANCHISOR must make all such changes in the authorized Franchise Marks on a uniform basis for all similarly situated Stores in a particular market.

**6.7    Validity and Ownership of Franchise Marks; Prohibition Against Disputing FRANCHISOR's Rights.**

Franchisee acknowledges the validity of the Franchise Marks and that the Franchise Marks and any and all goodwill in and to the Franchise Marks are the exclusive property of FRANCHISOR or third parties who have licensed such Marks to FRANCHISOR. Franchisee also agrees that any further rights or goodwill that may develop in any of the Franchise Marks in the future will inure solely to the benefit of FRANCHISOR, including, without limitation, any goodwill caused by or attributable to Franchisee's use of the Franchise Marks. Franchisee now asserts no claim and will in the future assert no claim to any goodwill, reputation or ownership of the Franchise Marks by virtue of Franchisee's licensed use of the Franchise Marks or for any other reason. Franchisee must not, during or after the term of this Agreement, in any way dispute or impugn the validity of the Franchise Marks, or the rights of FRANCHISOR in the Franchise Marks, or the rights of FRANCHISOR or other Franchisees of FRANCHISOR to use the Franchise Marks.

## ARTICLE 7 - FRANCHISE LOCATION, LEASE AND OTHER PRE-OPENING OBLIGATIONS

**7.1    Location Selection and Approval.**

The location for the Franchise Business must be approved in advance in writing by FRANCHISOR and Franchisee must always operate its Franchise Business only at a location approved in writing by FRANCHISOR (the location approved in writing by FRANCHISOR will be referred to in this Agreement as the "Franchise Location"). If a location for the Franchise Business has been determined and approved before the signing of this Agreement, that location will be designated in Item 1 of Appendix A. If the exact location of the Franchise Business has not been determined before signing of this Agreement, Franchisee must use its best efforts to find a suitable location for the Franchise Business within the area designated in Item 1 of Appendix A, but must obtain a lease for a site within **180** days from signing of this Agreement. Franchisee must submit to FRANCHISOR, in a form acceptable to FRANCHISOR, a description of the proposed site, evidence confirming the Franchisee's prospects for obtaining the site, demographic information, economic terms, use clause and any other materials FRANCHISOR specifies before FRANCHISOR will consider approving the location. Although FRANCHISOR may provide its assistance in obtaining a Franchise Location, it is Franchisee's responsibility to obtain and evaluate its commercial value for operation of the Franchise Business. FRANCHISOR's location recommendations and its approval of the Franchise Location do not constitute a representation or guaranty of the commercial value or success of the Franchise Location.

If the Franchise Location initially approved by FRANCHISOR becomes unusable for the Franchise Business, Franchisee must obtain written approval of a new site. If the initial Franchise

Location became unusable through no fault of Franchisee and a substitute location is not available, this Agreement will terminate on conclusion of operation of the Franchise Business at the initial Franchise Location.

**7.2    Lease Requirements.**

If Franchisee leases the Franchise Location from a third party, the terms and form of Franchisee's lease must be approved in writing by FRANCHISOR and the lease must not be terminated, or in any way altered or amended by Franchisee without the prior written consent of FRANCHISOR.

Franchisee's lease with a third party must contain the provisions specified by FRANCHISOR, including provisions: (a) prohibiting the Franchise Location from being used for any purpose other than a Store; (b) recognizing and allowing FRANCHISOR rights to assignment of the lease upon default by Franchisee of this Agreement or its lease with the Landlord; (c) recognizing and allowing FRANCHISOR's right to enter the Franchise Location to inspect and audit the Franchise Business or to make any modifications necessary to protect the Franchise Marks; (d) if the Franchise Location is located in a strip mall, enclosed mall, shopping center or similar location, prohibiting the landlord from leasing any other space in the mall or center to another business that sells the same products as a Store; (e) requiring the landlord to give written notice and an opportunity for FRANCHISOR or a person specified by FRANCHISOR, to cure any default of Franchisee under the lease before landlord exercises any remedy under the lease; (f) requiring landlord and Franchisee to give FRANCHISOR 30 days prior written notice of: (i) the cancellation or termination of the lease prior to the expiration date of the lease; (ii) an assignment or attempted assignment of the lease by the landlord or Franchisee; (iii) the sublease or attempted sublease by Franchisee; and (iv) any modification of the lease; and (g) requiring landlord and Franchisee to provide written notice to FRANCHISOR within 15 days after: (i) Franchisee exercises any option to extend the lease; (ii) landlord and Franchisee renew the lease; and (iii) the landlord institutes any action against Franchisee, including an eviction action.    Except in accordance with this Agreement, Franchisee must not assign its lease or let or sublet the Franchise Location or any portion of the Franchise Location without the prior written consent of FRANCHISOR.

**7.3    Licenses and Permits.**

Franchisee must obtain all zoning and other approvals and all permits or licenses required by federal, state or local law for construction and operation of the Franchise Business, including certificates of occupancy.

**7.4    Completion of Training.**

Franchisee must complete the training program specified by FRANCHISOR, to the satisfaction of FRANCHISOR, before beginning operation of the Franchise Business.

**7.5    Development of Franchise Business and Franchise Location.**

Franchisee must fully develop the Franchise Business in accordance with FRANCHISOR's specifications.  Franchisee must construct and/or improve the Franchise Location in compliance with FRANCHISOR's specifications, including but not limited to specifications for build-out,

16

decor, signage, equipment, space, etc. This includes the following responsibilities, which must be diligently performed by the Franchisee:

(a)     Hire an interior designer approved by FRANCHISOR to undertake and provide build-out specifications.

(b)     Employ a, licensed architect and/or engineer, as required by state and local codes, approved by FRANCHISOR, to prepare sealed construction documents to submit for building permits and a final set of construction documents using FRANCHISOR's plans and specifications.

(c)     Furnish FRANCHISOR with the final set of construction documents, including signage, and a summary of build out expenses on a form specified by FRANCHISOR.

(d)     Obtain approval of the plans and specifications from the landlord and local authorities and FRANCHISOR before beginning construction.

(e)     Obtain or require the contractor to obtain payment and performance bonds.

(f)     Obtain all zoning changes, sign permits and any other required permits and approvals.

(g)     Purchase or lease and install equipment, fixtures, furniture, inventory, accessories, supplies and signs needed for the opening of the Franchise Business in accordance with FRANCHISOR's specifications.

(h)     Complete the construction or remodeling of the Franchise Location in full and strict compliance with the plans and specifications approved by FRANCHISOR and the landlord and with all applicable ordinances, building codes and permits requirements.

(i)     Complete development of and have the Franchise Business ready to open and commence the conduct of its business by the date described in Section 8.1 of this Agreement.

Franchisee must diligently perform the responsibilities listed above at times reasonably required by FRANCHISOR in order to complete the development of the Franchise Business in a proper and timely manner. Franchisee must report to FRANCHISOR as to the progress of the development of the Franchise Business. FRANCHISOR may, but is not required to, assist the Franchisee in completing the above listed responsibilities. Where FRANCHISOR's action and response is required with respect to any of the Franchisee's obligations listed above, FRANCHISOR will act or respond in a reasonable and timely manner.

**7.7     Telephone Numbers; Internet Access; E-mail Addresses.**
Franchisee must acquire and maintain a minimum of two telephone lines dedicated solely to the Franchise Business. FRANCHISOR may, at its option, obtain and register in its name, the

telephone lines and numbers to be used at the Franchise Business. Franchisee must pay all costs and charges for the installation, maintenance and use of the telephone lines and numbers, even if those lines and numbers are obtained and registered in the name of FRANCHISOR. Franchisee must acquire and maintain at all times a static IP address and a high speed (T-1, Cable, DSL, Satellite or other high-speed access) Internet access for communication with customers and FRANCHISOR by email and other electronic means, connection to FRANCHISOR's intranet systems (if any) and to allow FRANCHISOR to access Franchisee's POS computer system remotely 24 hours a day and seven days a week. Franchisee must also acquire and maintain an e-mail address so that FRANCHISOR and Franchisee may communicate by e-mail. If specified by FRANCHISOR, Franchisee must participate in the centralized email system maintained by FRANCHISOR. In that case, Franchisee must pay FRANCHISOR a reasonable annual fee to cover FRANCHISOR's time and expenses involved in maintaining and servicing the centralized email system. The annual fee will be payable in advance on January 20th of each year.

## ARTICLE 8 - OPERATIONS

**8.1    Opening Date; Continuing Operations and Best Efforts.**
Franchisee must begin operation of the Franchise Business by the date specified in Item 3 of Appendix A, including conversion to the AVF System if Franchisee is a Conversion Store Franchisee, but no later than **270** days from execution of this Agreement. If operations do not begin by the specified date, FRANCHISOR may terminate this Agreement and retain all fees paid. Franchisee must continually operate the Franchise Business after opening in accordance with the provisions of this Agreement throughout the term of this Agreement. Franchisee must use its best efforts to promote and maximize the sales of the Franchise Business throughout the term of this Agreement. Franchisee must maintain at all times, sufficient equipment, supplies and personnel to operate the Franchise Business at optimal capacity and efficiency as specified by FRANCHISOR.

**8.2    Standards of Operation; Operations Manual.**
Franchisee acknowledges that every component of the Franchise System is important to FRANCHISOR and to the operation of the Franchise Business. Franchisee must, at all times, operate and maintain the Franchise Business in a competent manner and in full compliance with all aspects of the Franchise System specified by FRANCHISOR. In all business dealings with the public, Franchisee must be governed by the highest standards of honesty, integrity, fair dealing and ethical conduct.

Franchisee must comply with all lawful and reasonable policies and procedures specified by FRANCHISOR in connection with the operation of the Franchise Business. These specifications may include standards, techniques and procedures for: (a) the safety, maintenance, cleanliness, sanitation, function, hours of operation and appearance of the Franchise Business and its equipment, fixtures, inventory, decor and signs; (b) qualifications, dress, uniforms, grooming, general appearance, demeanor and training of employees; (c) the products and services required or authorized to be offered and sold by the Franchise Business; (d) type, quality, and uniformity and manner of sale of all of the products sold by the Franchise Business; (e) methods and procedures relating to receiving, preparing and delivering customer orders; (f) sales, advertising and promotional techniques and programs; (g) construction, maintenance and appearance of the Franchise Business and the Franchise Location; (h) payment, credit, accounting and financial

reporting policies and procedures; (i) use of FRANCHISOR's intranet (if established) for entering sales and other information, making schedules, projecting sales, ordering supplies, entering labor and other expenses, receiving reports and other operational requirements as specified by FRANCHISOR; (j) purchase and maintenance of equipment, fixtures and inventory; (k) insurance coverage; (l) use of standard forms; (m) use and protection of the Franchise Marks and other proprietary rights of FRANCHISOR in accordance with Franchise Mark Usage Guidelines, and any trade secret or information protection programs or other intellectual property policies established from time to time by FRANCHISOR; (n) use and illumination of exterior and interior signs, displays and similar items; (o) atmosphere of the Franchise Location, including, without limitation, such things as music and lighting; (p) warranties to customers and the handling of customer complaints and customer communications; (q) identification of the Franchise Business as an independently owned and operated business; (r) attendance by Franchisee and managers at required training programs and meetings; (s) maintenance of a minimum required number of trained staff at all times, based on the business needs of the Franchise Business; (t) using and honoring gift certificates, coupons and other such local and national promotional programs authorized or specified by FRANCHISOR; and (u) other details of the operation of the Franchise Business and the relationship between AVF and Franchisee.

The policies and procedures specified by FRANCHISOR may be contained in training, operating and marketing manuals of FRANCHISOR or in memos, bulletins, newsletters, emails, or other written or electronic materials prepared by FRANCHISOR (for the purposes of this Agreement, "Operations Manual" will mean all manuals or other written materials relating to the Franchise System or containing FRANCHISOR's specifications that are provided to Franchisee). Franchisee will be issued a copy of any currently existing Operations Manual after the signing of this Agreement or when and if prepared by FRANCHISOR and made available to franchisees. Franchisee will be issued any applicable modifications or additions to the Operations Manual as they become available. The Operations Manual remains the property of FRANCHISOR, must not be duplicated, must never be disclosed to any person or entity and must be returned to FRANCHISOR immediately on request or on expiration or termination of this Agreement.

Franchisee must at all times ensure that its copy of the Operations Manual is kept current and up to date. If there is a dispute as to the contents of the Operations Manual, the terms and dates of the master copy of the Operations Manual maintained by FRANCHISOR at its place of business will be controlling.

Due to the nature of operation of the Franchise Business and the fact that the specifications for the Franchise Business must and do change, FRANCHISOR reserves the right to change the Franchise System after the signing of this Agreement and to change the terms of the Operations Manual after the signing of this Agreement to reflect those changes. Franchisee must comply with all such changes immediately on written notice from FRANCHISOR of the change. The Operations Manual cannot change the terms of this Agreement, but will be in addition to this Agreement and will have the same effect as if set forth in this Agreement. If the Operations Manual is inconsistent with this Agreement, this Agreement will control. FRANCHISOR agrees that it will specify its policies and procedures in a reasonable manner.

**8.4** **Acquisition of Products and Services.**

Franchisee must obtain all equipment, fixtures, signs, inventory, and all other products and services from sources specified by FRANCHISOR for development and operation of the Franchise Business.

**8.5** **Specifications and Approved Suppliers for Products and Services.**

In order to maintain uniqueness, consistency, uniformity, quality and identity of the products and services offered and sold by Stores and the group purchasing power of FRANCHISOR, Franchisee must comply with the product and supply requirements set forth in this Section.

Franchisee must offer for sale only those products and services approved in advance in writing by FRANCHISOR. Franchisee must purchase all products (including AVF Products) supplies and equipment used in the development and operation of the Franchise Business in accordance with FRANCHISOR's specifications and only from FRANCHISOR or a manufacturer, supplier or distributor designated by FRANCHISOR (which may be an affiliate of FRANCHISOR) (an "Approved Supplier"). FRANCHISOR may add or delete Approved Suppliers from time to time and Franchisee must comply with those changes immediately on written notice from FRANCHISOR. If FRANCHISOR adds an Approved Supplier, Franchisee must immediately, on written notice from FRANCHISOR, take the steps necessary to comply with the credit, purchase and other policies of the Approved Supplier. If the Company deletes an Approved Supplier, Franchisee must cease purchasing products and services from that supplier immediately on written notice from FRANCHISOR.

Upon submission to FRANCHISOR of an alternative supplier, FRANCHISOR will review and evaluate such supplier to determine its ability to meet its standards and specifications, who possess adequate quality controls, and who have the capacity to supply the needs of Stores promptly and reliably. Such review will typically be completed within 60 days. FRANCHISOR reserves the right to limit the number of approved suppliers for purposes of efficiency and effective buying power.

FRANCHISOR may designated specified architectural and/or contractors to undertake construction, design and architectural work at the Franchised Location.

FRANCHISOR may, from time to time, enter into agreements with Approved Suppliers for and on behalf of all Stores in a particular region.

The designation by FRANCHISOR of an Approved Supplier does not create any express or implied promise, guaranty or warranty by FRANCHISOR as to the products or services of the Approved Supplier and FRANCHISOR will not have any liability to Franchisee for any claims, damages or losses suffered by Franchisee as a result of or arising from the products or services provided by the Approved Supplier or its acts or omissions.

FRANCHISOR and its affiliates will have the right to receive rebates or other fees from Approved Suppliers based on sales of products or services to any franchisee or Store(s). FRANCHISOR may use those rebates and fees for any purpose in FRANCHISOR's discretion.

Franchisee must cooperate with FRANCHISOR and its affiliates in the collection of those rebates and fees.

Any products or services sold by or through FRANCHISOR or its affiliates will be sold in accordance with the terms set forth in memos, bulletins, emails, franchisee meetings or otherwise in writing by FRANCHISOR, its affiliate or by the manufacturer of the products. These terms may be modified on written notice from FRANCHISOR, its affiliate or the manufacturer of the products.

**8.6** **Products and Services Offered by the Franchise Business; Pricing; Promotional Programs.**

Franchisee must sell all products and provide all services that FRANCHISOR specifies for sale for the Franchise Business. In conducting its Franchise Business, Franchisee must not sell any products (including AVF Products), provide any services or engage in any business at the Franchise Business or Franchise Location other than those specified by FRANCHISOR without written authorization from FRANCHISOR. FRANCHISOR may add or delete required or authorized products or services to be provided by the Franchise Business. If any products or services are added, Franchisee must be qualified to provide the products and services before FRANCHISOR will authorize Franchisee to offer those products and services. If a product or service is deleted, Franchisee must cease offering that product or service immediately on written notice from FRANCHISOR. FRANCHISOR will make all changes in the required products and services for good faith marketing reasons and on a uniform basis for all similarly situated franchisees in a particular market, except when test marketing products or services.

FRANCHISOR will provide guidance on the pricing of the products and services sold by Franchisee. Franchisee must follow any maximum pricing guidelines specified by FRANCHISOR, subject to applicable law.

Franchisee agrees to participate in any gifts cards, electronic gift or money cards (E-cards), frequency cards or other programs specified by FRANCHISOR and to honor all such cards issued by FRANCHISOR or by other franchisees in accordance with FRANCHISOR's policies. Franchisee acknowledges and agrees that Franchisee's participation in those programs is integral to the Franchise System and to the success of those programs. FRANCHISOR or a person designated by FRANCHISOR will administer any gift and E-card or other such programs specified by FRANCHISOR. Franchisee agrees that FRANCHISOR may charge an administrative fee for administrating those programs. Franchisee also agrees to honor and/or participate in discount coupons or similar promotional materials, drives, prizes, giveaways, contests and other programs, local, regional or national, related to sales promotions, specified by FRANCHISOR to the extent that participation does not violate federal or state law.

**8.7** **Maintenance; Refurbishing; Alterations.**

Franchisee must maintain the Franchise Location, its equipment, fixtures, decor and signs for the Franchise Business in a clean, attractive and safe condition and in good maintenance and repair and in compliance with the standards specified by FRANCHISOR. If at any time, in FRANCHISOR's reasonable judgment, the general state of repair, appearance or cleanliness of the Franchise Location or its equipment, décor, fixtures or signs do not meet FRANCHISOR's standards, FRANCHISOR may notify Franchisee in writing, specifying the action to be taken by

Franchisee to correct the deficiency. Franchisee must initiate the specified action within 30 days after receipt of the notice and diligently proceed to complete the specified action. If Franchisee fails to do so, then Franchisee will be deemed to be in breach of this Agreement, and, FRANCHISOR will have the right, in addition to its other rights under this Agreement, but will not be obligated to, enter the Franchise Location and cause the specified action to be taken on behalf of Franchisee and Franchisee must pay the entire cost to FRANCHISOR on demand.

In addition to regular maintenance obligations, after written notice from FRANCHISOR, not more than once during the franchise term, and upon renewal, Franchisee must rehabilitate, modernize, upgrade and replace fixtures, furniture, furnishings, signs and equipment and also to make changes in design, decoration and renovation adopted by Franchisor to maintain or improve the appearance and efficient operation of the Franchise Business. The requirement to refurbish the Franchise Location will be imposed uniformly on all Franchisees presently acquiring a franchise, but the expenses incurred in fulfilling the requirement will vary depending on such factors as the condition of the Franchise Location and local costs of construction. If the refurbishing requires spending less than $20,000, Franchisee will have 30 days to complete the refurbishing. If the refurbishing requires spending $20,000 or more, Franchisee will have 60 days to complete the refurbishing.

Upon renewal of the Franchise Agreement or permitted assignment of Franchise rights, the Franchisee or assignee as the case may be, must complete specified refurbishing of the Franchised Location within ninety (90) days after the date of renewal, or the closing of escrow upon assignment. If such refurbishing is not completed within such time, FRANCHISOR may terminate the renewal agreement or the Franchise Agreement and all rights of the Franchisee or assignee. FRANCHISOR shall notify Franchisee prior to renewal, or assignee and Franchisee prior to closing of escrow, of any refurbishing which it requires. Such refurbishing shall be performed pursuant to Franchisee's standards and criteria within the time period set forth herein as a condition to final approval as an authorized Franchisee and/or permitted assignee of Franchisee

Franchisee must make no material alterations to the leasehold improvements or appearance of the Franchise Location and must not make any material alterations to the equipment, fixtures or signs of the Franchise Business without prior written approval of FRANCHISOR.

## 8.8    Designated Owners; Managers.

The individual or at least one of the individuals designated in Item 4 on Appendix A (a "Designated Owner"), must: (a) devote his or her full time and effort to the day-to-day active management and operation of the Franchise Business; (b) personally exercise his or her best efforts to market the Franchise Business and maximize customer satisfaction; (c) preserve and exercise ultimate authority and responsibility with respect to the management and operation of the Franchise Business; and (d) represent and act on behalf of Franchisee in all dealings with FRANCHISOR. Each Designated Owner must have an ownership interest in Franchisee. If all of the Designated Owners resign, die or become incapacitated, it will be considered a transfer under the provisions of Article 13 of this Agreement. If Franchisee desires to have a manager, other than a Designated Owner, devote full time and effort to the day-to-day active management and operation of the Franchise Business in place of a Designated Owner, the manager must successfully complete the

training program designated by FRANCHISOR and must be approved, in writing, by FRANCHISOR. FRANCHISOR must also approve, in writing, any change in such management personnel. Franchisee must require all of its managers to sign an agreement relating to confidentiality in the form specified by FRANCHISOR as a condition of employment of the manager.

**8.9    Employees.**

Franchisee must implement a training program for employees in compliance with FRANCHISOR's standards. Franchisee must maintain at all times a staff of trained employees sufficient to operate the Franchise Business in compliance with FRANCHISOR's standards. Franchisee must require its employees and agents to sign an agreement relating to confidentiality in the form specified by FRANCHISOR as a condition of employment of the employee.

FRANCHISOR may impose a reasonable per diem charge for any training provided to Franchisee, its managers or employees, beyond the initial training program described in Section 10.1. Any such fees will be uniform as to all persons attending training at that time and will be based on FRANCHISOR's out-of-pocket expenses plus the per diem rate of the training personnel involved. These fees are not refundable.

**8.10    Insurance.**

Franchisee must obtain and provide FRANCHISOR with evidence of insurance in the minimum amounts and coverages as follows:

| Type of Coverage | Limits/Specifications |
|---|---|
| Premises Liability | $500,000.00 |
| Commercial Liability | $500,000.00 |
| Business Property | $500,000.00 |
| Workers' Compensation | Statutory Requirements |
| Hired and Non-Owned Automobile Liability | $1,000,000 Combined Single Limit |

Evidence of this insurance must be initially provided at least fourteen days before beginning operation of the Franchise Business. Certificates of renewal must be provided no later than fourteen days before the expiration date of each policy. If Franchisee does not provide FRANCHISOR with evidence of any required insurance policies at any due date, FRANCHISOR may (but is not obligated to) purchase that insurance at Franchisee's expense. Franchisee must immediately pay for any insurance obtained by FRANCHISOR.

Each required insurance policy must meet the following requirements: (a) the policy must name FRANCHISOR (and any affiliates of FRANCHISOR that FRANCHISOR may reasonably specify) and the area representative for the area, if any, as an additional insured; (b) the policy must not be subject to cancellation, modification or amendment except after 30 days written notice to

FRANCHISOR; (c) the insurance must be placed with an approved vendor and an insurance carrier with an AM Best's Rating of not less than A; (d) the policy must provide that failure by Franchisee to comply with any term, condition or provision of the insurance contract, or other conduct by Franchisee, will not void or otherwise affect the coverage afforded FRANCHISOR or its affiliates or area representatives (e.g. FRANCHISOR, although named as an insured, will nevertheless be entitled to recover under such policies on any loss occasioned to FRANCHISOR or its agents or employees by reason of the negligence of Franchisee or Franchisee's agents or employees); (e) the policy must contain a waiver of subrogation in favor of FRANCHISOR for casualty losses.

**8.11    Compliance with Laws and Other Obligations.**

Franchisee must obtain and keep in force every registration, charter, license or permit required for the Franchise Business. Franchisee must comply with all federal, state, county, municipal or other statutes, laws, ordinances, regulations, rules or orders applicable to the Franchise Business. Franchisee must pay, when due, all taxes of every kind applicable to the Franchise Business or the income of the Franchise Business, including all local, state or federal taxes. Franchisee must immediately notify FRANCHISOR if any governmental department or agency begins an investigation of the Franchise Business, schedules a review, inspection or audit of the Franchise Business or takes any action against the Franchise Business.

**8.12    Separate Identification of Franchise Business.**

Franchisee must identify the Franchise Business as a separate business by filing an assumed name certificate as appropriate in the state and/or county of location of the Franchise Business. Also, Franchisee must display signs, notices or plaques specified by FRANCHISOR to identify the separate ownership of the Franchise Business.

**8.13    Indemnification.**

Franchisee is responsible for all losses or damages from contractual liabilities to third persons from the possession, ownership and operation of the Franchise Business and all claims or demands for damages to property or for injury, illness or death of persons, directly or indirectly, arising out of, or in connection with, possession, ownership or operation of the Franchise Business or the actions or omissions of Franchisee. Franchisee must defend, indemnify and hold harmless FRANCHISOR and its affiliates, subsidiaries and parent companies and their agents, employees, attorneys and other franchisees, their agents, employees and attorneys, against any and all claims, suits, demands, losses, damages or liabilities and all related expenses, including reasonable attorneys fees and court costs, which arise out of, in connection with, or as a result of possession, ownership or operation of the Franchise Business or the acts or omissions of Franchisee. This indemnity obligation will continue in full effect even after the expiration, transfer or termination of this Agreement. FRANCHISOR will notify Franchisee of any claims against FRANCHISOR subject to this Section. FRANCHISOR may defend the action in the manner it deems appropriate and Franchisee must pay FRANCHISOR for all costs, including reasonable attorneys' fees, incurred by FRANCHISOR in defending the action, in addition to any sum which FRANCHISOR may pay by reason of any settlement or judgment against FRANCHISOR in the action. FRANCHISOR's right to indemnity under this Agreement will arise and be valid notwithstanding that joint or concurrent liability may be imposed on FRANCHISOR by statute, ordinance, regulation or other law.

**8.14** **Participation in Franchisee Advisory and other Committees.**
FRANCHISOR may establish committees of franchisees to advise FRANCHISOR on various matters involving the Franchise System. Franchisee will be eligible to participate on such committees, in accordance with the rules established by FRANCHISOR and each committee, but only if Franchisee is a Franchisee in good standing. In order to be a Franchisee in good standing, Franchisee must be: (a) current in all obligations to FRANCHISOR and (b) operating in accordance with the all requirements of the Franchise System, including requirements relating to quality, cleanliness and service.

**8.15** **Notices to FRANCHISOR.**
Franchisee must notify FRANCHISOR in writing of the details of any of the following events, within one business day of the occurrence of the event:

> (a)    The start of any civil or criminal action, suit, countersuit or other proceeding against Franchisee or any Designated Owner.

> (b)    Franchisee, or any Designated Owner, receives a notice of noncompliance with any law, rule or regulation.

> (c)    The issuance of any order, writ, injunction, award or decree of any court, any agency or other governmental organization against Franchisee or any Designated Owner.

> (d)    Any complaints, inspections, reports, warnings, certificates or ratings of Franchisee or the Franchise Business, communicated, issued, performed, or scheduled by any governmental agency.

Franchisee must provide FRANCHISOR with any additional information FRANCHISOR requests, within five days of request, about the status, progress or outcome of any of the events listed in this Section.

## ARTICLE 9 – ADVERTISING

**9.1** **Grand Opening Advertising.**
Franchisee must spend, as required in Section 4.3, an amount to be used for grand opening advertising for the Franchise Business ("Franchisee's Grand Opening Advertising Payment"). This amount will be used for advertising for the Franchise Business within the period beginning seven (7) days before the opening of the Franchise Business and ending seven (7) days after the opening of the Franchise Business or as otherwise agreed by FRANCHISOR and Franchisee. FRANCHISOR and Franchisee will work together to develop a grand opening advertising plan, which must be approved by FRANCHISOR. Franchisee will be responsible for implementing the plan.

**9.2** **National Marketing Fund.**
Franchisee must make weekly contributions, as required under Section 4.3, to a National Marketing Fund (the "NMF" or "Fund") that will be administered by FRANCHISOR or an agency designated by FRANCHISOR. The Fund will be used to maximize general public recognition

and patronage of the Franchise Marks and Franchise System. Franchisor will use the Fund to formulate, develop, and produce advertising and promotional programs and to conduct advertising and promotional programs on a national, regional or local level as FRANCHISOR determines, in its discretion, to be most effective in achieving its goals. This includes but is not limited to producing advertising and promotional materials for use by all AVF franchisees; pay outside consultants; fund media placement of marketing, advertising and promotion materials, direct mail, AVF website, Internet and other programs, public relations programs and payments to national trade associations; and reimbursement of FRANCHISOR for costs in administering the marketing and advertising program. FRANCHISOR is not required to spend any designated amount to place advertising in Franchisee's local area or in any specific media.

As described below, any advertising placed by Franchisee must be approved in advance by FRANCHISOR. FRANCHISOR may engage the services of an advertising agency or sources to formulate, develop, produce and conduct advertising and these costs will be paid by the Fund. FRANCHISOR will not use the Fund for advertising that is primarily for the solicitation for the sale of franchises.

If Franchisor does not use Fund contributions during the fiscal year in which they accrue, Franchisor will hold those funds for use in the following year.

FRANCHISOR will submit to Franchisee, on request, an annual report of the receipts and disbursements of the advertising fund, which may be unaudited and prepared by management of FRANCHISOR.

In no event will FRANCHISOR or any agency engaged by FRANCHISOR be liable for consequential or incidental damages resulting from administration of the advertising fund or resulting from any advertising produced or placed by or on behalf of FRANCHISOR or Franchisee or the failure to produce or place such advertising, including any claims for loss of business, and Franchisee waives any such claims.

**9.3    Local Advertising.**
Franchisee is required to spend each month on local advertising an amount that is not less than 3% of Gross Sales. Copies of monthly advertising expenditures shall be submitted to FRANCHISOR at the time of monthly NMF payments. In the event such local advertising requirement is not met by Franchisee, FRANCHISOR shall have the option to electronically debit from Franchisee's bank account an amount equal to 3% of Gross Sales last reported by Franchisee, which amount shall be spent by FRANCHISOR for expenses related to creation of advertising and placement of same in Franchisee's local market area.

**9.4    Additional Advertising; Approval of Advertising Materials.**
All advertising by Franchisee in any medium, including signage, must be factual and dignified, must conform to the standards and specifications of FRANCHISOR, and to the highest standards of ethical advertising practice, and must be approved by FRANCHISOR in writing before it is used. No handwritten signs or otherwise non-conforming sign designs are allowed. No computer generated signs are allowed unless they have been provided by FRANCHISOR or

26

approved in writing by FRANCHISOR. Franchisee must submit to FRANCHISOR for approval all marketing and promotion materials, including signage, prepared by Franchisee for the Franchise Business and not prepared by or previously approved by FRANCHISOR. These materials must be submitted to FRANCHISOR at least 14 days before use. Franchisee agrees to refrain from any business or advertising that may be injurious to the business of FRANCHISOR and the goodwill associated with the Franchise Marks and Franchise System and other Stores.

All local advertising, promotion and marketing or similar materials shall be submitted to FRANCHISOR for approval and shall be approved in writing prior to its placement by Franchisee. In the event FRANCHISOR fails to respond within fifteen (15) days from Franchisor's receipt of proposed advertising from Franchisee, the request shall be deemed to be denied. Franchisee shall not advertise any products or services for the Franchised Location, other than those Products or Services licensed by this Agreement or otherwise approved in writing by Franchisor.

Franchisee must advertise generally in accordance with the announced recommendations of Franchisor and shall change or discontinue any advertising if requested to do so by FRANCHISOR for reasonable cause. Reasonable cause shall include, but not be limited to, advertising which violates any provision of this Agreement; is unduly offensive; materially out of character with FRANCHISOR's quality image; or will harm or undermine FRANCHISOR, other Franchisees or the Franchise System.

FRANCHISOR may develop from time to time, various advertising aids, program, folders, media and other materials for the use and benefit of all Franchisees and promotion of the Franchise System. Franchisee must avail itself of such materials to the extent feasible and practical for its Franchised Location and local market.

In the event that Franchisee places any advertisement or similar notice seeking a buyer for the Franchise or seeking a loan or an investor, Franchisee shall not include nor allow the words "AVF " or "Art Van" to appear to be a part of any such advertisement or notice. Franchisee may, however, describe the business in general generic terms. Franchisee agrees to enforce this restriction on the activities of its sales agents, brokers and representatives.

Franchisee agrees to use in the operation of its business only such stationery, business cards and printed materials uniformly used by all Franchisees or otherwise approved by FRANCHISOR in writing. FRANCHISOR agrees to approve any reputable local company that is convenient to Franchisee as a source of printed materials if so requested by Franchisee, provided that such company is capable of reproducing the materials.

In the event Franchisee determines to offer special discounts or coupons to induce customers to patronize its Franchise Business, such discounts or coupons must state the following legend: "THIS COUPON IS VALID ONLY AT (YOUR ADDRESS). OTHER AVF LOCATIONS MAY BE INDEPENDENTLY OWNED AND OPERATED AND ARE UNDER NO OBLIGATION TO ACCEPT THIS COUPON." If Franchisee's coupons are accepted by other franchisees or Company owned locations, upon Franchisor's request, Franchisee must reimburse

the coupon-accepting location the difference between its regular price and the price obtained pursuant to the coupon(s) it accepted.

**9.5    Use of Internet, Websites, Catalogues or Toll-Free Telephone Numbers.**

FRANCHISOR retains the sole right to solicit or accept orders directly or through other channels of distribution, such as the Internet, websites, catalog sales, telemarketing, or other direct marketing under the AVF System. Franchisee may not offer AVF Products or services directly or through other channels of distribution, such as the Internet, websites, catalog sales, telemarketing, or other direct marketing outside of your Protected Territory, except as set forth below.  Franchisee may not offer or market AVF Products through any of the methods set forth in this Section 9.5 without the prior written approval of FRANCHISOR.

## ARTICLE 10 – TRAINING

**10.1    Initial Training.**

FRANCHISOR or its designated representative will make available an initial program to train Franchisee to operate the Franchise Business.  This training program will be offered for not less than two (2) weeks at FRANCHISOR's home office in Warren, Michigan and not less than two (2) weeks at your site. Franchisee must not begin operating the Franchise Business unless a Designated Owner has attended and completed to FRANCHISOR's satisfaction, the initial training program.  The training program will be conducted for up to two (2) persons (Designated Owners and manager), without charge to Franchisee.  If requested by Franchisee, FRANCHISOR may, in its discretion, allow additional persons to attend the initial training program, but may, in that case, charge a reasonable per diem fee for the training. Also, Franchisee will be responsible for paying its and its employees' salaries, expenses for travel, food and lodging incurred during the training program.  The persons attending the initial training program must sign an agreement relating to confidentiality in the form specified by FRANCHISOR before beginning the training program.

**10.2    Franchisee's Training Program.**

After beginning operation of the Franchise Business, Franchisee must establish and maintain a continual program of training for management and staff personnel in accordance with FRANCHISOR's specifications.  Each employee of the Franchise Business must complete each part of the specified training program and Franchisee must not employ anyone who refuses or fails to complete each part of the specified training program.

**10.3    Additional Training, Sales Programs and Meetings.**

A Designated Owner (or, if authorized by FRANCHISOR, a manager) must, solely at Franchisee's expense, attend additional training, sales programs and meetings reasonably specified by FRANCHISOR.  This includes but is not limited to annual conventions or conferences and monthly franchise meetings if specified by FRANCHISOR.  FRANCHISOR will give reasonable notice of any additional specified training, sales programs or meetings.  FRANCHISOR may impose a reasonable charge on the Franchisee for any training provided to Franchisee, its managers or employees beyond the initial training program, including seminars and conferences.  Any such fees will be uniform as to all persons attending additional training at that time and will be based on FRANCHISOR's out-of-pocket expenses plus a per diem rate for the training personnel.

FRANCHISOR may require Franchisee to complete additional training before offering new products or services from the Franchise Business. All costs to attend training will be borne by Franchisee, including travel, lodging and meals.

## ARTICLE 11 - CONFIDENTIAL INFORMATION

**11.1    Confidential Information Defined.**
FRANCHISOR owns and possesses, and on signing of this Agreement Franchisee has the right to possess, certain proprietary and/or confidential information relating to developing and operating a Store (the "Confidential Information"). The Confidential Information includes, but is not limited to:

(a)    Operations Manuals, training methods, operating methods, policies, procedures, systems and data;

(b)    Knowledge and experience relating to Stores;

(c)    Advertising programs and marketing techniques used in developing and operating Stores;

(d)    All information regarding the identities and business transactions of customers and suppliers;

(e)    Computer software and similar technology that has been or may be developed by or for FRANCHISOR or its agents, which is proprietary to FRANCHISOR, including, without limitation, digital passwords and identifications and any source code of, and data, reports, and other printed materials generated by, the software or similar technology;

(f)    Knowledge of the operating results and financial performance of Stores;

(g)    Other aspects of the Franchise System now or later revealed to Franchisee under this Agreement and all changes and enhancements in the Franchise System, even if developed by Franchisee.

(h)    Other property that FRANCHISOR describes as being Confidential Information or trade secrets of the Franchise System.

**11.2    Ownership and Use of Confidential Information.**
Franchisee acknowledges that FRANCHISOR owns the Confidential Information and agrees that Franchisee will not acquire any interest in the Confidential Information, other than the right to use it as FRANCHISOR specifies solely for the purpose of establishing and operating the Franchise Business during the term of this Agreement. Franchisee acknowledges and agrees that the Confidential Information is proprietary to FRANCHISOR and is disclosed to Franchisee in

confidence only on the condition that Franchisee and its shareholders, officers, directors, partners, members, owners, investors, employees and agents agree that they will:

    (a)    Not use the Confidential Information in any business or capacity other than in the Franchise Business as authorized by this Agreement, both during the term of this Agreement and after expiration or termination of this Agreement for as long as the Confidential Information is not generally known in the industry;

    (b)    Keep each item deemed to be part of Confidential Information absolutely confidential, both during the term of this Agreement and after expiration or termination of this Agreement for as long as the item is not generally known in the industry;

    (c)    Not make unauthorized copies of any Confidential Information disclosed via electronic medium or in written or other tangible form and not remove any Confidential Information from the Franchise Location;

    (d)    Adopt and implement procedures to prevent unauthorized use or disclosure of Confidential Information, including, without limitation, restricting its disclosure to Franchisee's employees; and

    (e)    Require Franchisee's employees and agents to sign an agreement relating to confidentiality in the form specified by FRANCHISOR before revealing any aspect of the Confidential Information to the employee or agent.  FRANCHISOR has the right to be a third party beneficiary of those agreements with independent enforcement rights.

**11.3**    **Development of New Proprietary or Confidential Information.**
All ideas, concepts, techniques, improvements or materials that relate to or enhance the Franchise Business or the Franchise System, whether or not protectable intellectual property and whether created by or for FRANCHISOR or by or for Franchisee, must be promptly disclosed to FRANCHISOR and will be FRANCHISOR's sole and exclusive property, part of the Franchise System, and works made-for-hire for FRANCHISOR.  Franchisee hereby assigns ownership of the intellectual property, and all related rights to it, to FRANCHISOR to the extent that any intellectual property does not qualify as a "work made-for-hire" for FRANCHISOR.  Franchisee agrees to take whatever action (including signing an assignment or other documents) that FRANCHISOR requests to evidence FRANCHISOR's ownership in the intellectual property.

**11.4**    **Expiration, Termination or Transfer of this Agreement.**
Franchisee agrees that when this Agreement expires, is terminated, or on the transfer of the Franchise Business, Franchisee will immediately cease using any and all of the Confidential Information in any business or otherwise, and return to FRANCHISOR all copies of all Confidential Information that Franchisee has in its possession.  Franchisee will be liable to FRANCHISOR for any use of the Confidential Information not authorized by this Agreement.

## ARTICLE 12 – RESTRICTIONS ON COMPETITION

**12.1    Covenant Not to Compete During Term.**

With exception of an existing retail furniture store owned and operated by Franchisee at the time of execution of this Agreement, which will be used as the premises for operation of an AVF Franchise Business, Franchisee, its shareholders, officers, directors, partners, members, owners, investors, consultants and spouses must not, during the term of this Agreement, have any interest in, as an owner, shareholder, member, director, officer, manager, employee, consultant, representative or agent, or in any other capacity, or otherwise engage in, any "Competing Business" (defined in Section 12.3), (except other Stores operated under franchise agreements entered into with FRANCHISOR), or in any business or entity that franchises, licenses, or otherwise grants to others the right to operate a Competing Business, unless otherwise agreed in writing by FRANCHISOR.

**12.2    Other Restrictions During Term.**

Franchisee, its shareholders, members, officers, directors, partners, owners, investors, consultants and spouses must not, during the term of this Agreement: (a) divert or attempt to divert any business or customer of the Franchise Business or any other Store to any Competing Business by direct or indirect inducements or otherwise; (b) employ or seek to employ any person who was, at the time, employed by FRANCHISOR or its affiliates or by another Store, or directly or indirectly induce any person to leave their employment with FRANCHISOR or its affiliates or with another Store; or (c) sponsor, appoint or encourage or influence or promote friends, relatives or associates to operate a Competing Business.

**12.3    Definition of Competing Business.**

For purposes of this Agreement, a "Competing Business" includes any business that is the same or similar to the Franchise Business and Store licensed to Franchisee, including but not limited to a business that sells home and office furniture, mattresses, flooring, window treatments, electronics, appliances and other related items  offered by FRANCHISOR and Stores now or in the future.

**12.4    Acknowledgements and Agreements Relating to Restrictions on Competition.**

Franchisee acknowledges and agrees that the restrictions contained in this Article are fair and reasonable.  The parties have attempted to limit Franchisee's right to compete only to the extent necessary to protect the reasonable competitive business interests of FRANCHISOR and its franchisees.  If the above restrictions or any part of these restrictions are invalid, this Article will be considered as imposing the maximum restrictions allowed under the applicable state law in place of the invalid restriction or part of the restriction.  In addition, FRANCHISOR reserves the right to reduce the scope of these provisions without Franchisee's consent, at any time, effective immediately on notice to Franchisee.

**12.5    Covenant Not to Compete After Termination or Expiration of Franchise Term.**

For two (2) years following the termination or expiration of this Agreement, whether by lapse of time or by other cause, sale and/or assignment of the franchise granted under this Agreement or the Franchise Business or by purchase by FRANCHISOR of all or substantially all of the assets of Franchisee pursuant to this Agreement, Franchisee shall not, directly or indirectly, either as a shareholder, member, officer, director, partner, owner, investor, consultant or spouse,

engage in any other business or Store that is a Competing Business or is similar to, the business of the nature and type described under this Agreement within fifty (50) miles of (i) Franchisee's former Protected Territory, (ii) the Protected Territory of any other AVF franchisee, or (iii) any company-owned or Affiliate operated AVF Businesses selling AVF Products.

## ARTICLE 13 - TRANSFERABILITY

**13.1    General Rule.**

This Agreement is personal to Franchisee or to the owners of Franchisee if Franchisee is a corporation, partnership, limited liability company or other entity. Accordingly, neither Franchisee nor any person owning any direct or indirect ownership or equity interest in Franchisee, may, without FRANCHISOR's prior written consent, directly or indirectly or contingently, whether voluntarily or by operation of law, sell, assign, transfer, convey, give away, pledge, mortgage or otherwise encumber any interest in: (a) this Agreement; (b) the Franchise Business or any of the assets of the Franchise Business; (c) the Franchise Location; or (d) any equity or voting interest in Franchisee. Any such act or event described above in this Section or any other act defined as a transfer elsewhere in this Agreement will be referred to as a "Transfer." Any permitted Transfer must only be made in accordance with the provisions of this Article 13. Franchisee does not have the right to sublicense any of the rights granted by this Agreement. Any attempted Transfer not in accordance with this Agreement will have no effect and will constitute a breach of this Agreement.

**13.2    Conditions of FRANCHISOR'S Consent to Transfer; Right of First Refusal.**

Before any Transfer, Franchisee or any person owning an interest in Franchisee, or another appropriate person, must give written notice of the proposed Transfer to Franchisor, setting forth in detail the nature of the items to be transferred, the name, address and background of the proposed transferee, the consideration for the Transfer and any other information that FRANCHISOR may reasonably require. This notice must also include a copy of any agreements relating to the proposed Transfer. After reviewing the information, FRANCHISOR will determine, in accordance with the provisions of this Agreement and any procedures specified in the Operations Manual, whether to grant its consent to the Transfer. If these conditions are met, FRANCHISOR will not unreasonably withhold its consent to a proposed Transfer of the type permitted by this Agreement.

Before FRANCHISOR consents to a proposed Transfer, the following conditions must be fulfilled:

(a)    The proposed transferee must follow the same application procedures as a new franchisee and must meet the same standards of character, business experience, financial strength, credit standing, reputation, business ability, experience, etc. as FRANCHISOR has set for any new franchisee.

(b)    The terms of the proposed transfer must not place unreasonable burdens on the proposed transferee.

(c)    Franchisee must be in full compliance with all provisions of this Agreement and must pay FRANCHISOR all monies owing and must sign at the time of Transfer an agreement terminating or transferring this Agreement (at FRANCHISOR's option) and

releasing FRANCHISOR and its affiliates and their owners, directors, members, employees and agents from any claims.

(d)     The proposed transferee must execute FRANCHISOR's standard confidentiality agreement and satisfactorily complete FRANCHISOR's initial training program. FRANCHISOR may impose a reasonable charge for this training program.

(e)     The proposed transferee must, at FRANCHISOR's option: (i) sign with FRANCHISOR a Franchise Agreement on the standard form in use by FRANCHISOR at the time of Transfer, which agreement would have a term equal to the term remaining under this Agreement, or (ii) sign, with Franchisee, an assignment and assumption satisfactory to FRANCHISOR, whereby the proposed transferee would be entitled to all of Franchisee's rights under this Agreement and assume all of Franchisee's obligations under this Agreement.

(f)     The proposed transferee must pay FRANCHISOR a transfer fee in an amount equal to 25% of the initial franchise fee being charged by FRANCHISOR at the time of the transfer, which would be due at the time of execution of a consent by FRANCHISOR to the proposed Transfer. This fee is not refundable.

(g)     The proposed transferee must agree that, within 90 days of the transfer, it will take any action specified by FRANCHISOR to make the Franchise Business comply with current appearance, equipment and signage requirements.

(h)     Franchisee and the proposed transferee must comply with any other standard procedures specified by FRANCHISOR.

(I)     Franchisee must execute FRANCHISOR's standard mutual release agreement.

Franchisee acknowledges that the conditions listed above are necessary for protection of the Franchise Marks and Franchise System and do not impose unreasonable restrictions on a Transfer.

In addition to the above, if Franchisee desires to sell the franchise to a bona fide buyer and assign this Agreement, it shall serve upon FRANCHISOR a written notice setting forth all of the terms and conditions of the proposed sale and assignment and all available information concerning the proposed buyer. FRANCHISOR shall have a right of first refusal ("**Right of First Refusal**") to purchase the franchise for itself or its nominee upon the same terms and conditions specified in Franchisee's notice, except that, in FRANCHISOR's discretion, it may substitute cash for any deferred payment included in the buyer's offer. To exercise its right of first refusal, FRANCHISOR must give Franchisee written notice of its election by no later than thirty (30) days following its receipt of Franchisee's notice. If FRANCHISOR either fails to give timely notice, or gives notice that it declines to exercise its right, Franchisee may thereafter sell the business to the proposed buyer, but not at a lower price nor on terms which materially vary from those offered to Franchisee and provided, further, that all of the conditions to such sale set forth in this Section 13.2 are satisfied, including FRANCHISOR's approval of the proposed

buyer's qualifications.  If FRANCHISOR's consent to the proposed sale is granted, but the franchise is not sold to the buyer within six (6) months from the date it is first offered to FRANCHISOR, then Franchisee must re-offer to sell it to FRANCHISOR prior to a sale to any third party.

### 13.3    Transfer on Death or Incapacity.

If Franchisee or the last surviving owner of Franchisee (if Franchisee is a corporation, partnership, limited liability company or other entity) dies or becomes incapacitated, Franchisee's or its owner's rights under this Agreement will pass to the estate, heirs, devisees or legal representatives of Franchisee or its owner (collectively referred to in this Agreement as the "estate").  The estate may continue operation of the Franchise Business if:  (a) the Franchise Business is not closed for more than 7 business days and is thereafter operated in accordance with applicable law; (b) the estate provides a qualified individual acceptable to FRANCHISOR to manage and operate the Franchise Business on a full time basis; (c) the manager attends and successfully completes FRANCHISOR's training program at the estate's expense; and (d) the manager assumes full time operation of the Franchise Business within 90 days of the date Franchisee or its owner dies or becomes incapacitated.  If the estate fails to designate an acceptable manager or the designated manager fails to attend and satisfactorily complete the training program and to assume the full time operation of the Franchise Business within 90 days of the death or incapacity, then the estate must sell the estate's interest in the Franchise Business or in this Agreement within 180 days of the date of death or incapacity.  Any sale will require FRANCHISOR's consent under Section 13.2

After the date of death or incapacity, until a trained manager assumes full time operational control of the Franchise Business or until the estate's interest in the Franchise Business or in this Agreement is sold, FRANCHISOR may, at its option, assume control of and operate the Franchise Business.  During any period that FRANCHISOR operates the Franchise Business, FRANCHISOR may deduct its expenses for payroll, travel, lodging, meals and all other expenses and fees from the Franchise Business's revenues.  Any remaining revenues of the Franchise Business, after paying all other operational expenses of the Franchise Business will be paid to the estate.  Any deficiency in amounts due to FRANCHISOR under this Section or any deficiencies from operation of the Franchise Business must be paid by the estate within 10 days of a notice of deficiency from FRANCHISOR.   FRANCHISOR is not obligated to operate the Franchise Business.   If FRANCHISOR does operate the Franchise Business, FRANCHISOR will not be responsible for any operational losses of the Franchise Business, nor will FRANCHISOR be obligated to continue operation of the Franchise Business.

### 13.4    Transfers to Controlled Entities or Trust.

If Franchisee is in full compliance with this Agreement, the Agreement may be assigned to a corporation, partnership, other entity in which Franchisee owns and will continue to own a majority of the issued and outstanding stock, partnership interest, or other ownership interests and in which Franchisee will act as its principal executive officer or manager ("Controlled Entity"), or a Trust controlled by Franchisee, provided that:

(a)     All owners of the Controlled Entity execute this Agreement and agree to be personally bound, jointly and severally, by all of the provisions of this Agreement;

34

(d)     The Controlled Entity agrees to be bound by all the provisions of this Agreement and to assume and discharge all of Franchisee's obligations under this Agreement; and

(e)     The Controlled Entity will have no right to engage in a Transfer except in accordance with the provisions of Article 13 of this Agreement.

In the event the legal interest of member or shareholder is assigned to a Trust of such individual for purposes of estate planning, such event shall not be deemed to be a Transfer under this Agreement.

**13.5    Assignment by FRANCHISOR.**

This Agreement is fully assignable by FRANCHISOR and will inure to the benefit of any assignee or other legal successor to the interests of FRANCHISOR.  FRANCHISOR may sell, assign, discount or otherwise transfer any rights under this Agreement or any other assets of FRANCHISOR or its owners, without notice to or approval of Franchisee or any other Franchisee, at any time.  However, Franchisor will remain liable for the performance of its obligations under this Agreement or will make provision for the performance of those obligations by the assignee, to the extent required by applicable law.

## ARTICLE 14 – DEFAULT AND TERMINATION

**14.1    Default by FRANCHISOR; Termination by Franchisee.**

FRANCHISOR will be considered in default of this Agreement if FRANCHISOR breaches any material obligations of FRANCHISOR under this Agreement.  Franchisee may terminate this Agreement only if: (a) Franchisee is in full compliance with all terms of this Agreement; (b) Franchisee provides written notice to FRANCHISOR specifying a material default of this Agreement by FRANCHISOR and the proposed date of termination; and (c) FRANCHISOR has committed the default and has not cured the default within 30 days of written notice from Franchisee of the default.  Written notice from Franchisee of the default must specify in writing with particularity the nature of the default and the steps Franchisee requests that FRANCHISOR take to cure the default. FRANCHISOR will have not less than 30 days to cure the default.  Failure of Franchisee to comply with the provisions of this Section will result in any attempt to terminate being deemed null and void and without legal effect.

**14.2    Default by Franchisee; Termination by FRANCHISOR.**

Franchisee will be considered in default of this Agreement on the occurrence of any of the events listed in Sections 14.3 and 14.4 or elsewhere in this Agreement.  FRANCHISOR has the right to terminate this Agreement before its expiration only for good cause and only in accordance with the requirements of Sections 14.3 or 14.4 below.    Good cause for termination by FRANCHISOR includes any default of this Agreement by Franchisee.

**14.3    Events of Default by Franchisee; No Right to Cure.**

Any of the following events will constitute a default by Franchisee and good cause for termination of this Agreement by FRANCHISOR.  On the happening of any of these events, FRANCHISOR may, at its option, terminate this Agreement effective on delivery of written notice

to Franchisee without affording Franchisee an opportunity to cure (except as may be required by applicable law).

(a)     Franchisee fails to enter into a lease or sublease for a Franchise Location as required by this Agreement.

(b)     FRANCHISOR determines that Franchisee cannot, will not or has not completed FRANCHISOR's pre-opening training programs to the satisfaction of FRANCHISOR, or fails to demonstrate the qualities and abilities that FRANCHISOR deems necessary for the successful operation of the Franchise Business.

(c)     Franchisee is unable to obtain, without extraordinary administrative proceedings or litigation, any permit or license necessary to develop and open the Franchise Business.

(d)     Any material misrepresentation, dishonesty or fraud by Franchisee to or against FRANCHISOR or its agents or affiliates, or suppliers or customers of the Franchise Business.

(e)     A substantial number of complaints from customers relating to products or services provided by Franchisee or the acts or omissions of Franchisee.

(f)     Any assignment or transfer of this Agreement or the Franchise Business without complying with Article 13 of this Agreement.

(g)     The conviction of, or plea of guilty or no contest by Franchisee or a Designated Owner to: (i) a crime, offense or misconduct for which the minimum penalty includes imprisonment for more than one year; or (ii) any crime, offense or misconduct for which the minimum penalty includes imprisonment for one-year or less that involves fraud or dishonesty or is in any other way relevant to the operation of the Franchise Business.

(h)     Franchisee has received three or more prior notices of default and/or to terminate, whether or not for the same or similar default, during any consecutive 12-month period.

(i)     Franchisee has failed to attend two or more required monthly meetings within any consecutive 12-month period.

(j)     Any abandonment by Franchisee of the Franchise Business. Abandonment will be conclusively presumed if Franchisee fails to open the Franchise Business for business for a period of three (3) consecutive business days without the prior written consent of FRANCHISOR or fails to open the Franchise Business for business for a total of five (5) business days within a 90 day period.

(k)    Franchisee operates the Franchise Business in a manner that presents a health or safety hazard to its customers, employees, or the public, and the same cannot by its nature be cured within a reasonable time period.

(l)    Intoxication, illegal drug use or other substance abuse by Franchisee or a Designated Owner that interferes with the operation of the Franchise Business.

(m)    Any conduct by Franchisee that reflects materially and adversely on the operation or reputation of the Franchise Marks or Franchise System.

(n)    Adjudication of bankruptcy of Franchisee, the insolvency of the Franchise Business, appointment of a receiver or trustee to take charge of the Franchise Business by a court of competent jurisdiction or the general assignment by Franchisee for the benefit of creditors.

**14.4    Events of Default by Franchisee; Right to Cure.**
Any of the following events will constitute a default by Franchisee and good cause for termination of this Agreement by FRANCHISOR. On the happening of any of these events, FRANCHISOR may, at its option, terminate this Agreement effective on written notice to Franchisee and Franchisee's failure to cure the defaults during a cure period set forth below:

(a)    Failure of Franchisee to promptly pay its obligations to FRANCHISOR, an affiliate of FRANCHISOR or third party suppliers as they become due, or the occurrence of any other default under a lease or finance agreement for the real or personal property involved in the Franchise Business.

(b)    Failure of Franchisee to operate in accordance with the uniform standards of FRANCHISOR, failure of Franchisee to meet current minimum performance standards according to the provisions of the Operations Manual or failure to permit store evaluations and inspections by FRANCHISOR's representatives.

(c)    Failure of Franchisee to purchase products and services for use in the Franchise Business from Approved Suppliers.

(d)    If Franchisee is an entity other than a natural person, any dispute, disagreement or controversy among the stockholders, members, partners, directors, officers or managers of Franchisee, which materially and adversely affects the ownership, operation, management or business of the Franchise Business.

(e)    Any other material breach of this Agreement by Franchisee or a material breach by Franchisee or any corporation, partnership, limited liability company or other entity controlling, controlled by or under common control with Franchisee or any of the owners of Franchisee, of any of the terms of any other agreements entered into with FRANCHISOR or its affiliates.

(f)    The cancellation of any guaranty of the obligations of this Agreement by any owner of Franchisee.

Written notice of termination from FRANCHISOR under this Section 14.4 must specify any defaults under this Agreement or other reasons for termination and the date the termination will be effective. The effective date of termination must be: (i) at least 15 days from the date of notice for defaults involving the payment of money to FRANCHISOR or its affiliates; and (ii) at least 30 days from the date of notice in all other instances. Termination will be automatically effective without further action by FRANCHISOR on the date specified in the notice as the effective date of termination unless Franchisee completely cures, before the date specified in the notice as the effective date of termination, all the defaults or other reasons for termination specified by FRANCHISOR in the notice.

## 14.5    Right to Withhold Products and Support Services on Certain Defaults by Franchisee.

If Franchisee commits any of the defaults listed below, FRANCHISOR will have the right to refuse to sell or make available to Franchisee any products, including but not limited to AVF Products, and to cause Approved Suppliers to refuse to sell products to Franchisee and to withhold support services from Franchisee. The defaults giving rise to this remedy include: (a) a payment due to FRANCHISOR from Franchisee is more than 30 days past due; (b) Franchisee owes Franchisor's suppliers $10,000 or more in past due payments; or (c) any other default under this Agreement that has not been cured within 30 days of written notice. The remedies set forth in this Section will not be the sole remedies of FRANCHISOR for such defaults and FRANCHISOR may exercise any other remedies, including but not limited to, termination of this Agreement.

## ARTICLE 15 - EFFECT OF TERMINATION OR EXPIRATION

### 15.1    Obligations of Franchisee.

On expiration or termination of this Agreement for any reason (including termination on a transfer), Franchisee's rights to use the Franchise Marks and the Franchise System and all other rights associated with being an authorized franchisee of FRANCHISOR will cease and Franchisee must do the following:

(a)    Franchisee must immediately and permanently discontinue the use of the Franchise Marks, the Franchise System and any marks and names and logos confusingly similar to the Franchise Marks, and any other materials that may, in any way, indicate that Franchisee is or was a franchisee of FRANCHISOR, or in any way associated with FRANCHISOR.

(b)    Franchisee must immediately discontinue all advertising placed or ordered. Franchisee must remove and deliver to FRANCHISOR all sign faces, advertising and promotional material, stationery, letterhead, forms and any other items bearing the Franchise Marks. Franchisee must bear the cost of sign and other identification removal and the cost of shipping signs and other materials to FRANCHISOR. If Franchisee remains

in possession of the Franchise Location, Franchisee must alter the premises to distinguish the premises from the appearance of a Store.

(c)     Franchisee must cease using the Operations Manual and all proprietary business information provided by FRANCHISOR and must return to FRANCHISOR all copies of the Operations Manual and other materials received from FRANCHISOR containing information about the Franchise Business.

(d)     Franchisee must immediately and permanently cease to use all telephone and fax numbers, email addresses, websites, domain names and other comparable electronic identifiers that have been used in the Franchise Business and if requested by FRANCHISOR, must assign all such telephone and fax numbers, email addresses, website addresses, domain names and other comparable electronic identifiers to FRANCHISOR. Franchisee acknowledges that as between FRANCHISOR and Franchisee, FRANCHISOR has the sole rights to all telephone and fax numbers, email addresses, websites addresses, domain names and other comparable electronic identifiers used in the Franchise Business and all written and online directory listings associated with the Store. Franchisee authorizes FRANCHISOR, and appoints FRANCHISOR and any officer of FRANCHISOR as its attorney-in-fact, to direct the applicable service providers and all listing agencies to transfer those items to FRANCHISOR or its agent or assignee if Franchisee fails or refuses to do so. The applicable service providers and all listing agencies may accept the direction in this Agreement as conclusive evidence of the exclusive rights of FRANCHISOR in such telephone and fax numbers, email addresses, website addresses, domain names, other comparable electronic identifiers and directory listings and its authority to direct their transfer.

(e)     Franchisee must cease using any business name containing any of the Franchise Marks and must file an abandonment or discontinuance of the name with the appropriate local, county or state agency.

(f)     Franchisee must immediately pay all sums and debts owing to FRANCHISOR and its subsidiaries and affiliates, whether such sums and debts owing to FRANCHISOR and its subsidiaries and affiliates are evidenced by promissory note, invoice, bill or other writing, and notwithstanding the fact that such sums and debts may not at that time be fully due and payable, such debts being accelerated automatically without further notice to Franchisee.

(g)     Franchisee must sell to FRANCHISOR all or part of Franchisee's inventory or products on hand as of the date of termination or expiration that are uniquely identified with FRANCHISOR, if any, as FRANCHISOR may request in writing before or within 30 days after the date of termination or expiration.  The sales price will be the current published prices then being charged by the manufacturer or supplier to authorized franchisees of FRANCHISOR, not including any costs of storage or transportation paid by Franchisee to bring the goods initially to the Franchise Business, minus all costs incurred or to be incurred by FRANCHISOR to restore the goods or the packaging of the goods to a

saleable condition and minus a reasonable allowance for physical deterioration, obsolescence or damage to the extent not restored.

## 15.2   Option to Assume Lease.

If this Agreement terminates or expires for any reason, other than a termination by Franchisee for cause, FRANCHISOR will have the right to assume Franchisee's lease for the Franchise Location. If FRANCHISOR exercises this right, FRANCHISOR must assume and hold Franchisee harmless from all liability under the lease arising after the assumption by FRANCHISOR. If the Franchise Location is owned by Franchisee and this Agreement terminates or expires for any reason other than a termination by Franchisee for cause, FRANCHISOR will have the option to lease the Franchise Location on substantially the same terms and conditions contained in Franchisee's lease for the Franchise Location, or, if no lease exists, then on terms and conditions that are commercially reasonable. The options granted in this Section must be exercised by FRANCHISOR within 30 days of the date of expiration or termination of this Agreement.

## 15.3   Option to Purchase Assets;

If this Agreement expires or terminates for any reason, except termination by Franchisee for cause, FRANCHISOR will have the option, but not the obligation to purchase the assets of the Franchise Business. The purchase price will be the fair value of the assets as agreed by the parties or in the absence of an agreement, as determined by an independent qualified appraiser selected by FRANCHISOR and Franchisee. If FRANCHISOR and Franchisee cannot agree on an independent appraiser, each will select an independent appraiser qualified or certified to make the appraisal. The independent appraisers chosen will then select a third independent appraiser. The third independent appraiser will determine the fair value of the assets and his or her determination will be binding on the parties. The purchase price will be reduced by any current and long-term liabilities of the Franchise Business that FRANCHISOR agrees to assume and any amounts owing to FRANCHISOR by Franchisee. FRANCHISOR must exercise the option granted in this Section within 45 days following the determination of a price for the assets. Closing of the sale must take place within 45 days after FRANCHISOR exercises its option to purchase the assets or a later date, if agreed to by the parties, as necessary to comply with applicable bulk sales or other similar laws.

## 15.4   Surviving Obligations.

Termination or expiration of this Agreement will not affect Franchisee's obligations or liability to FRANCHISOR for amounts owed to FRANCHISOR under this Agreement or for FRANCHISOR's damages attributable to the loss of bargain resulting from termination of this Agreement before its expiration (as set forth in Section 15.5). Also, termination of this Agreement will not affect Franchisee's obligations under Article 6 relating to the Franchise Marks, Section 8.13 relating to indemnification, Article 11 relating to confidentiality, Section 15.3 relating to FRANCHISOR's option to purchase the assets of the Franchise Business, Article 16 relating to dispute resolution and other obligations in this Agreement or any other agreements between Franchisor and third parties, which, by their terms or intent, survive termination or expiration of this Agreement.

## 15.5   Damages for Loss of Bargain.

In addition to any other remedies available to FRANCHISOR, if this Agreement is terminated before its expiration (other than termination by Franchisee for cause), FRANCHISOR

will be entitled to recover from Franchisee damages attributable to the loss of bargain resulting from that termination. The parties stipulate and agree that the damages for FRANCHISOR's loss of bargain will be the present value of the royalty fees that would have been payable to FRANCHISOR for the lesser of: (i) the balance of the term of this Agreement if this Agreement had not been terminated; or (ii) 36 months. The parties agree that the total amount of royalty fees that would have been payable will be calculated utilizing annual Gross Sales equal to the average annual Gross Sales of the Franchise Business for the two year period [or such lesser period if Franchisee was not in operation for a full two year period] immediately preceding the date of termination. For the purposes of this Section, Gross Sales will be calculated based on Gross Sales reported by Franchisee or as actually determined by an audit of Franchisee's business. If Franchisee has failed or refused to report Gross Sales for any part of its operation before termination, FRANCHISOR may reasonably estimate those Gross Sales.

The parties acknowledge and agree that the actual damages that would be sustained by FRANCHISOR if this Agreement is terminated before its expiration are incapable of calculation at the time of execution of this Agreement. The parties further acknowledge and agree that the damages set forth in this Section are a reasonable estimation of those damages.

**15.6    Remedies.**
Termination or expiration of this Agreement and/or enforcement of the provisions of this Article will not affect or prejudice any other rights or remedies of FRANCHISOR for breach of this Agreement by Franchisee whether those rights and remedies are contained in this Agreement or otherwise provided by law or equity.

## ARTICLE 16 – DISPUTE RESOLUTION; LAW AND JURISDICTION; INJUNCTIVE RELIEF; COSTS OF ENFORCEMENT; JURY WAIVER; LIMITATIONS OF CLAIMS

**16.1    Negotiation.**
Except for actions described in Section 16.6, the parties will try to resolve all disputes by having the Franchisee or a Designated Owner negotiate with an executive officer of FRANCHISOR to resolve the dispute, including at least one face-to-face meeting. The parties agree to conduct these negotiations in good faith and to use their best efforts to resolve any such disputes. If the parties have not resolved the dispute within 30 days after beginning these negotiations, then either party may demand arbitration of the dispute in accordance with Sections 16.2 and 16.3.

**16.2    Binding Arbitration.**
Except for actions described in Section 16.7, all controversies, disputes or claims between: (a) FRANCHISOR and/or its officers, directors, members, managers, employees, agents or representatives; and (b) Franchisee, and/or its officers, directors, members, managers, employees, agents or representatives; arising out of or related to this Agreement or any other agreement between Franchisor and Franchisee or any provision of such agreement, or FRANCHISOR's relationship with Franchisee, or any other dispute between Franchisor and Franchisee, must be submitted for binding arbitration in accordance with the provisions of this Article 16 on the demand of either party. A party may demand arbitration for a dispute only after complying with the duty to

negotiate contained in Section 16.1.  Except as otherwise provided in this Article 16, such arbitration proceeding must be conducted in accordance with the commercial arbitration rules (the "Rules") of the American Arbitration Association ("AAA").  The Federal Arbitration Act (9 U.S.C. §§ 1 et seq.) (the "Act") and not any state arbitration law will govern all matters relating to arbitration.

The provisions of this Article 16 are intended to benefit and bind certain third party non-signatories and will continue in full force and effect after and notwithstanding the expiration or termination of this Agreement.

**16.3    Arbitration Procedures.**

Any matter will be adjudicated before one (1) arbitrator unless FRANCHISOR elects for the dispute to be decided before a panel of three (3) arbitrators.  The arbitration will be administrated and conducted in the office of the AAA in or closest to Southfield, Michigan.  The parties desire that at least one of the arbitrators be an attorney familiar with franchise matters. The arbitrator will follow the Rules except as otherwise provided in this Section.  The arbitrator will comply with the Federal Rules of Evidence; will grant limited discovery consisting of written interrogatories and requests for production of documents eliciting only relevant evidence; will provide for the exchange of witness lists and exhibit copies; and will conduct a pretrial and rule on dispositive motions.  Each party will have the right to request the arbitrator to make findings of specific factual issues.

FRANCHISOR and Franchisee agree to be bound by the provisions of any limitation on the period of time in which claims must be brought under applicable law or this Agreement, whichever expires earlier.  FRANCHISOR and Franchisee further agree that, in connection with any such arbitration proceeding, each must submit or file any claim that would constitute a compulsory counterclaim (as defined by Rule 13 of the Federal Rules of Civil Procedure) within the same proceeding as the claim to which it relates.  Any such claim that is not submitted or filed as described above will be forever barred.

**16.4    Decision of Arbitrator.**

The arbitrator will have the right to award or include in the award any relief that the arbitrator deems proper under the circumstances, including, without limitation, money damages (with interest on unpaid amounts from the date due), specific performance, injunctive relief and attorney's fees and costs, provided that the arbitrator will not have the right to award special, exemplary or punitive damages.  The decision of the arbitrator will be final and binding on the parties, subject only to appeal rights under the Act, and a judgment by a court of competent jurisdiction may be entered in accordance with the decision.

**16.5    Applicable Law.**

This Agreement takes effect on its acceptance and execution by FRANCHISOR in Michigan, and, except for the applicability of the Federal Arbitration Act, will be interpreted and construed under the laws of Michigan.  In the event of any conflict of law, the laws of Michigan will prevail, without regard to the application of Michigan conflict-of-law rules.  If, any

provision of this Agreement would not be enforceable under the laws of Michigan, and if Franchisee's business is located outside of Michigan and such provision would be enforceable under the laws of the state in which Franchisee's business is located, then such provision will be interpreted and construed under the laws of that state.

**16.6    Injunctive Relief; Venue**

Notwithstanding Sections 16.1 and 16.2, FRANCHISOR will have the right, without the posting of any bond or security and without the need to prove irreparable injury, to obtain specific enforcement of the terms of this Agreement from a court of competent jurisdiction, by temporary or permanent injunctions or other equitable relief. Each party stipulates to the jurisdiction of the Macomb County Circuit Court or Federal District Court in Detroit with regard to this Section 16. FRANCHISOR will have the right, without limitation, to obtain injunctive relief to prevent Franchisee from engaging in the following acts, which Franchisee acknowledges would cause irreparable harm to FRANCHISOR: (a) using any of the rights franchised by this Agreement, including use of the Franchise Marks, in any manner not authorized in this Agreement; (b) engaging in operations in violation of the in-term restrictions on competition set forth in Article 12; (c) disclosing to any person or using the trade secrets or confidential information of FRANCHISOR in violation of the terms of this Agreement; (d) transferring or assigning this Agreement or the assets of the Franchise Business without complying with this Agreement; (e) engaging in acts or practices in violation of applicable laws and regulations or that are fraudulent, dishonest or create health or other hazards to the public; or (f) significantly impairing the goodwill associated with FRANCHISOR. FRANCHISOR's rights to obtain injunctive relief are in addition to all other remedies available to FRANCHISOR under applicable law.

**16.7    Costs of Enforcement.**

If any arbitration or legal action or other proceeding is begun for the enforcement of this Agreement, or for an alleged dispute, breach, default or misrepresentation under any term of this Agreement, then FRANCHISOR, if FRANCHISOR is the prevailing party, is entitled to recover reasonable pre-institution and post-institution attorneys fees, court costs, and all expenses even if not taxable as court costs (including all fees and expenses incident to appellate, bankruptcy and post-judgment proceedings), incurred in the action or proceeding in addition to all other relief to which FRANCHISOR is entitled. Attorneys fees includes paralegal fees, administrative costs, investigative costs, costs of expert witnesses, court reporter fees, sales and use taxes, if any, and all other charges billed by the attorney to the prevailing party. If FRANCHISOR engages legal counsel because of Franchisee's failure to pay when due any monies under this Agreement or submit when due any reports, information or supporting records, or for any failure to otherwise comply with this Agreement, Franchisee must reimburse FRANCHISOR on demand for all of the above listed expenses FRANCHISOR incurs.

**16.8    Jury Waiver; Time Period for Bringing Claims; Limitation of Damages.**

FRANCHISOR AND FRANCHISEE IRREVOCABLY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER AT LAW OR IN EQUITY, BROUGHT BY EITHER OF THEM AGAINST THE OTHER, WHETHER OR NOT THERE ARE OTHER PARTIES IN SUCH ACTION OR PROCEEDING.

ALL CLAIMS ARISING UNDER THIS AGREEMENT OR FROM THE RELATIONSHIP BETWEEN THE PARTIES ARE BARRED UNLESS AN ACTION IS FILED AND TIMELY SERVED ON THE OPPOSING PARTY WITHIN ONE YEAR FROM THE DATE THE PARTY KNEW OR SHOULD HAVE KNOWN OF THE FACTS CREATING THE CLAIM, EXCEPT TO THE EXTENT ANY APPLICABLE LAW OR STATUTE PROVIDES FOR A SHORTER PERIOD OF TIME TO BRING A CLAIM OR AS OTHERWISE REQUIRED BY LAW.

FRANCHISEE WAIVES IN ANY JUDICIAL ACTION, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO OR CLAIM OF ANY SPECIAL, PUNITIVE OR EXEMPLARY DAMAGES AGAINST FRANCHISOR AND AGREES THAT IN THE EVENT OF A DISPUTE BETFRANCHISOREN THEM, FRANCHISEE WILL BE LIMITED TO THE RECOVERY OF ANY ACTUAL DAMAGES SUSTAINED BY FRANCHISEE.

**16.9**    **Survival.**
The provisions of this Article 16 will continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.

## ARTICLE 17 – ADDITIONAL PROVISIONS

**17.1**    **Independent Contractor.**
Franchisee is and will be considered an independent contractor with control and direction of its business and operations limited only by the conditions set forth in this Agreement or otherwise specified by FRANCHISOR. No agency, employment, partnership or joint venture is created by this Agreement and neither party has the right to act on behalf of the other. The parties acknowledge that this Agreement does not create a fiduciary relationship between the parties.

**17.2**    **Waivers.**
The failure or delay of any party at any time to require performance by another party of any provision of this Agreement, even if known, will not affect the right of that party to require performance of that provision or to exercise any right under this Agreement. The failure or delay of FRANCHISOR to require performance by another franchisee of any provision of its franchise agreement, even if known, will not affect the right of FRANCHISOR to require performance of that provision in this Agreement or to exercise any right under this Agreement. Any waiver by any party of any breach of any provision of this Agreement is not a waiver of any continuing or later breach of that provision, a waiver of the provision itself, or a waiver of any right under this Agreement. No notice to or demand on any party in any case, of itself, entitles that party to any other notice or demand in similar or other circumstances.

**17.3**    **Consents, Approvals and Satisfaction.**
Whenever FRANCHISOR's consent or approval is required under this Agreement, consent or approval will not be unreasonably withheld or delayed unless specifically stated in this Agreement to the contrary. All consents or approvals required of FRANCHISOR are not binding on FRANCHISOR unless the consent or approval is in writing and signed by the president or a managing member of FRANCHISOR. FRANCHISOR's consent or approval, whenever required, may be withheld if Franchisee is in default under this Agreement. Where the satisfaction of

FRANCHISOR is required under this Agreement, unless the Agreement expressly states otherwise, the satisfaction is determined in FRANCHISOR's sole discretion.  FRANCHISOR will not be liable to Franchisee in any manner for providing or failing to provide or for any delay in providing any waiver, approval, assistance, consent or suggestion to Franchisee.  Franchisee waives any claims against FRANCHISOR for such liability.

## 17.4    Third Parties.

Except as provided in this Agreement to the contrary for any affiliates or franchisees of FRANCHISOR, nothing in this Agreement, whether expressed or implied, is intended to confer any rights under this Agreement on any person other than the parties and their respective personal representatives, other legal representatives, heirs, successors and permitted assigns.

## 17.5    Cumulative Remedies.

All remedies, either under this Agreement or by law or otherwise afforded, will be cumulative and not alternative.

## 17.6    Notices.

Notices under this Agreement must be in writing signed by the party serving the same and must be sent by: (a) registered or certified mail, return receipt requested, postage pre-paid, in which case the notice will be complete two days after mailing; (b) overnight courier service, in which case the notice will be complete one day after delivery to the overnight courier; or (c) facsimile with proof of completion, in which case the notice will be complete one day after proof of completion. The notice must be sent to the address or facsimile number set forth below or at such address or facsimile number as designated by notice pursuant to this Section.

|  | |
|---|---|
| If to FRANCHISOR: | AVF  FRANCHISING, LLC |
| | Attention:  David Braun, Director |
| | 6500 E. 14 Mile Road |
| | Warren, Michigan 48092 |
| | Tele. No. 586-983-3040 |
| | |
| If to Franchisee: | See Item 5 of Appendix A. |

## 17.7    Unavoidable Contingencies.

Neither party will be responsible for any contingency that is unavoidable or beyond its control, such as strike, flood, war, rebellion, governmental limitation or Act of God.

## 17.8    Entire Agreement; Modifications.

This Agreement and all appendices and other documents attached to this Agreement which are incorporated in this Agreement, will constitute the entire agreement between the parties.  This Agreement supersedes and replaces any and all previous or contemporaneous written and oral agreements or understandings, promises, representations or dealings between the parties.  Nothing in this Section or otherwise in this Agreement is intended to disclaim or waive Franchisee's reliance on any authorized statements made in the Franchise Disclosure Document delivered to Franchisee or in the exhibits and amendments to the Franchise Disclosure Document.  This Agreement may not be amended or modified except in a writing signed by both parties, except that

FRANCHISOR may unilaterally modify the Franchise System and its specifications as provided in this Agreement.

**17.9    Severability.**
Each Section, part or provision of this Agreement will be considered severable. If any Section, part or provision is found unenforceable by a court of competent jurisdiction, that determination will not impair the operation or affect the validity of the remainder of this Agreement.

**17.10   Uniformity.**
Franchisee acknowledges that some franchisees may operate under different forms of franchise agreements and that consequently, FRANCHISOR's obligations and rights with respect to its various franchisees may differ materially in different circumstances.

**17.11   Obligations Joint and Several.**
If there is more than one individual or entity signing this Agreement as Franchisee, all such persons are jointly and individually liable for Franchisee's obligations under this Agreement.

**17.12   Signing by FRANCHISOR.**
The submission of this Agreement is not an offer by FRANCHISOR and FRANCHISOR is not bound in any way until this Agreement is signed by an executive officer or an authorized representative of FRANCHISOR.

**17.13   Ownership of Franchisee.**
The owners and percentage of ownership of Franchisee are listed on Appendix B.

**17.14   Headings.**
Article and Section headings are for convenience of reference only and do not limit or affect the provisions of this Agreement.

**17.15   No Class Action or Consolidation**. Each party hereto agrees that any mediation, arbitration or litigation will only be conducted on an individual, not a class-wide basis, and that an arbitration or litigation proceeding between the FRANCHISOR and Franchisee may not be consolidated with any other litigation or arbitration proceeding between the parties and any other person, corporation, limited liability company, partnership or other entity. The parties waive, to the fullest extent allowed by law, any right to pursue or participate as a lead plaintiff, petitioner or class representative in any claim on a class or consolidated basis.

## ARTICLE 18 – REPRESENTATIONS AND ACKNOWLEDGEMENTS

**18.1    No Authority.**
NO SALESPERSON, REPRESENTATIVE OR OTHER PERSON HAS THE AUTHORITY TO BIND OR OBLIGATE FRANCHISOR EXCEPT ITS AUTHORIZED OFFICER BY A WRITTEN DOCUMENT. FRANCHISEE ACKNOWLEDGES THAT NO REPRESENTATIONS, PROMISES, INDUCEMENTS, GURANTEES OR WARRANTIES OF ANY KIND ARE MADE BY FRANCHISOR OR ON FRANCHISOR'S BEHALF WHICH

HAVE LED FRANCHISEE TO ENTER INTO THIS AGREEMENT. FRANCHISEE UNDERSTANDS THAT WHETHER FRANCHISEE SUCCEEDS AS A FRANCHISEE IS DEPENDENT UPON YOUR EFFORTS, BUSINESS JUDGMENTS, THE PERFORMANCE OF YOUR EMPLOYEES, MARKET CONDITIONS AND VARIABLE FACTORS BEYOND OUR CONTROL OR INFLUENCE. FRANCHISEE FURTHER UNDERSTANDS THAT SOME FRANCHISEES ARE MORE OR LESS SUCCESSFUL THAN OTHER FRANCHISEES AND THAT FRANCHISOR HAS MADE NO REPRESENTATION THAT FRANCHISEE WILL DO AS WELL AS ANY OTHER FRANCHISEE.

**18.2   Receipt.**
FRANCHISEE ACKNOWLEDGES RECEIPT OF FRANCHISOR'S FRANCHISE DISCLOSURE DOCUMENT WITHIN 14 CALENDAR DAYS PRIOR TO THE EXECUTION OF THIS AGREEMENT. FRANCHISEE FURTHER ACKNOWLEDGES THAT FRANCHISEE RECEIVED A COMPLETED COPY OF THIS AGREEMENT AND ALL RELATED AGREEMENTS ATTACHED TO THE FRANCHISE DISCLOSURE DOCUMENT, WITH ANY CHANGES TO SUCH AGREEMENTS UNILATERALLY AND MATERIALLY MADE BY FRANCHISOR AT LEAST SEVEN (7) CALENDAR DAYS PRIOR TO THE DATE ON WHICH THIS AGREEMENT AND ALL RELATED AGREEMENTS WERE EXECUTED.

**18.3   Opportunity for Review by Franchisee's Advisors.**
FRANCHISEE ACKNOWLEDGES THAT AVF HAS RECOMMENDED, AND THAT FRANCHISEE HAS HAD THE OPPORTUNITY TO OBTAIN, REVIEW OF THIS AGREEMENT AND FRANCHISOR'S FRANCHISE DISCLOSURE DOCUMENT BY FRANCHISEE'S LAWYER, ACCOUNTANT OR OTHER BUSINESS ADVISOR PRIOR TO EXECUTION HEREOF.

**18.4   Execution of Agreement.**
EACH OF THE UNDERSIGNED PARTIES WARRANTS THAT IT HAS THE FULL AUTHORITY TO SIGN AND EXECUTE THIS AGREEMENT. IF YOU ARE A PARTNERSHIP, LIMITED LIABILITY COMPANY OR CORPORATION, THE PERSON EXECUTING THIS AGREEMENT ON BEHALF OF SUCH PARTNERSHIP, LIMITED LIABILITY COMPANY OR CORPORATION WARRANTS TO FRANCHISOR, BOTH INDIVIDUALLY AND IN HIS CAPACITY AS PARTNER, MEMBER, MANAGER OR OFFICER, THAT ALL OF THE PARTNERS OF THE PARTNERSHIP, ALL OF THE MEMBERS OR MANAGERS OF THE LIMITED LIABILITY COMPANY, OR ALL OF THE SHAREHOLDERS OF THE CORPORATION, AS APPLICABLE, HAVE READ AND APPROVED THIS AGREEMENT, INCLUDING ANY RESTRICTIONS WHICH THIS AGREEMENT PLACES UPON RIGHTS TO TRANSFER THEIR INTEREST IN THE PARTNERSHIP, LIMITED LIABILITY COMPANY OR CORPORATION.

**18.5   Independent Investigation.**
FRANCHISEE ACKNOWLEDGES THAT FRANCHISEE HAS CONDUCTED AN INDEPENDENT INVESTIGATION OF THE BUSINESS CONTEMPLATED BY THIS AGREEMENT AND RECOGNIZES THAT IT INVOLVES BUSINESS RISKS WHICH MAKE THE SUCCESS OF THE VENTURE LARGELY DEPEND UPON FRANCHISEE'S BUSINESS ABILITIES AND EFFORTS. FRANCHISEE ACKNOWLEDGES THAT IT HAS BEEN GIVEN

THE OPPORTUNITY TO CLARIFY ANY PROVISION OF THIS AGREEMENT THAT FRANCHISEE MAY NOT HAVE INITIALLY UNDERSTOOD AND THAT FRANCHISOR HAS ADVISED FRANCHISEE TO HAVE THIS AGREEMENT REVIEWED BY AN ATTORNEY.

### 18.6   Reliance.

YOU UNDERSTAND THAT FRANCHISOR AND ANY OF FRANCHISOR'S REPRESENTATIVES AND/OR AGENTS WITH WHOM FRANCHISEE HAS MET HAVE NOT MADE AND ARE NOT MAKING ANY PROMISES OR GUARANTEES AS TO THE EXTENT OF FRANCHISEE'S SUCCESS IN FRANCHISEE'S FRANCHISED BUSINESS, AND HAVE NOT AND ARE NOT IN ANY WAY PROMISING ANY SPECIFIC AMOUNTS OF EARNINGS OR PROFITS IN ASSOCIATION WITH FRANCHISEE'S BUSINESS. IF ANY SUCH PROMISES, STATEMENTS OR REPRESENTATIONS HAVE BEEN MADE, FRANCHISEE AGREES TO ADVISE FRANCHISOR BEFORE SIGNING THIS AGREEMENT AND UNDERSTAND THAT FRANCHISEE CANNOT RELY UPON THEM IN MAKING FRANCHISEE'S DECISION.

FRANCHISOR and Franchisee have signed this Agreement on the dates set forth beside their signatures to be effective as of the date set forth at the beginning of this Agreement.

WITNESS:                                  AVF FRANCHISING, LLC

By: _____

Its: _____

Dated: ___3 – 18 – 13___

Thomas Allen Lynch and Tamara Ann Lynch

(Individual Franchisee(s))

(Individual Franchisee(s)

Dated: ___3 – 18 – 13___

48

## APPENDIX A—SPECIFICS

**ITEM 1:**  The location of the Franchise Business as referred to in Sections 2.1 and 7.1 ("Franchise Location") or the area in which the Franchise Business will be located is:

**Site TBA in Owosso, Michigan**

**ITEM 2:**  The Protected Territory under Section 2.3 is:  The protected territory for this franchise location is a (7) seven mile geographic radius around the address Site TBD in Owosso, Michigan.

**ITEM 3:**  The designated opening date of the Franchise Business, under Section 8.1 is September 18th, 2013.

**ITEM 4:**  The Designated Owners under Section 8.8 is/are:

Thomas Allen Lynch and Tamara Ann Lynch

**ITEM 5:**  Franchisee's address and facsimile number for purposes of notice under Section 17.6 are:

8114 Stanley Road, Flushing, Michigan 48433       Fax: (989) 723 - 2466

Dated: 3-18-13

AVF FRANCHISING, LLC

By: _____

Its: _____

_____
(Individual Franchisee(s))

_____
(Individual Franchisee(s))

## APPENDIX B—OBLIGATIONS AND REPRESENTATIONS OF INDIVIDUALS INVOLVED IN THE FRANCHISE BUSINESS

Each of the individuals signing below are directly or indirectly beneficially interested in the Franchise Business and join in and agree to be jointly and severally and personally bound by all the terms and provisions of this Agreement, other than those requiring the payment of money by Franchisee, to the same extent and in the same manner as Franchisee is bound. This paragraph will not impair any separate instrument of guaranty or subordination that any of the individuals signing below have executed or may execute in the future.

Each of the individuals signing below represent that the following is correct and true:

**Legal Name of Franchisee**:   Thomas Allen Lynch and Tamara Ann Lynch

**Type of Entity and State of Organization** (sole proprietorship, corporation, partnership, limited liability company, etc.):  Sole Proprietorship

**d/b/a (if applicable):**  N/A

**Address of Franchisee:** 8114 Stanley Road, Flushing, Michigan 48433

**Business Telephone:**  989-723-8122

**Name, Address, Phone No., Title and % of Ownership of each Owner of an interest in Franchisee or the Franchise Business:**

| | |
|---|---|
| Name | Thomas Allen Lynch |
| Address | 8114 Stanley Road, Flushing, Michigan 48433 |
| Telephone | 810-659-1401 |
| Title | _Thomas Allen Lynch_    % Ownership _50_ |

| | |
|---|---|
| Name | Tamara Ann Lynch |
| Address | 8114 Stanley Road, Flushing, Michigan 48433 |
| Telephone | 810-659-1401 |
| Title | _Tamara A Lynch_    % Ownership _50_ |

(Attach additional sheets if necessary)

_Thomas Allen Lynch_                Dated: _3-18-13_

_Tamara A Lynch_                Dated: _3·18·13_

## APPENDIX C – TYPE OF FRANCHISE STORE

Franchisor and Franchisee agree that the type of franchise store to be operated by Franchisee is (place check mark next to store selection as applicable):

Conventional Furniture Store: ____ X _____

Clearance Center Store: Store _____

**APPENDIX D – INITIAL FRANCHISE FEE DEBT FORGIVENESS RIDER, PROMISSORY NOTE AND SECURITY AGREEMENT**

### RIDER TO FRANCHISE AGREEMENT DATED March 18th, 2013 BY AND BETWEEN AVF FRANCHISING, L.L.C. ("FRANCHISOR") AND Thomas Allen Lynch and Tamara Ann Lynch ("FRANCHISEE")

This Rider to the above-entitled Franchise Agreement ("Agreement") is made and entered into this 18th day of March, 2013, by and between **AVF FRANCHISING, L.L.C.** ("Franchisor") and
Thomas Allen Lynch and Tamara Ann Lynch ("Franchisee") with respect to the following:

### RECITALS:

WHEREAS, Franchisor and Franchisee have entered into the above referenced Agreement with respect to Franchisee's operation of a "AVF " franchise selling to the general public home and office furniture, mattresses, flooring, window treatments, electronics, appliances and other related items under the AVF licensed Marks and franchise System and

WHEREAS, Franchisee has requested and Franchisor has agreed to offer to Franchisee the opportunity for 50% (Percent) of Franchisee's Initial Franchise Fee of $50,000 owing under the Agreement to be forgiven over a period of five (5) years provided that certain terms and conditions are met by Franchisee;

NOW, therefore for valuable consideration, receipt of which is hereby acknowledged, the parties agree as follows:

1.      In consideration of the build out and remodeling fee to be incurred by Franchisee in the minimum amount of $50,000, Franchisor and Franchisee agree that Franchisor's Initial Franchise Fee of $50,000 shall be reduced by Fifty Percent (50%) to $25,000 and paid by Franchisee upon execution of the Agreement. The remaining Fifty Percent (50%) of the Franchise Fee shall not be paid upon execution of the Agreement, but shall be paid by Franchisee executing a forgivable five (5) year Promissory Note in the amount of $25,000, including interest at the federal prime rate plus 2% (the "Franchise Fee Debt"). The Promissory Note to be signed by Franchisee is attached hereto as Appendix D-1 and a Security Agreement is attached hereto as Appendix E. The Franchise Fee Debt and applicable interest shall be forgiven or reduced at the rate of twenty per cent (20%) per year provided that Franchisee complies with all of the following criteria: (i) proof of build out or remodeling expenditures pursuant to Franchisor's standards and criteria in the minimum amount of $50,000 is provided to Franchisor prior to Store opening; (ii) Franchisee has remained current in all obligations owing under the Franchise Agreement; (iii) Franchisee has completed grand opening within 90 days of conversion; and (iv) Franchisee has attended all annual conventions. The Note shall provide that if these conditions are not met, the balance of the initial franchise fee less credits earned will be due to Franchisor.

2.    All other terms and conditions of the Agreement shall be unaffected by this Rider.


   IN WITNESS WHEREOF, the parties hereto have executed this Rider as of the date set forth above.

AVF FRANCHISING, LLC

By: _____

Its: _____


FRANCHISEE:  Thomas Allen Lynch and Tamara Ann Lynch

By: _____

Its: _____

By: _____

Its: _____

## APPENDIX D-1

## PROMISSORY NOTE – INITIAL FRANCHISE FEE FINANCING

$25,000

Dated:  March 18, 2013

**FOR VALUE RECEIVED**, the undersigned Maker promises to pay to the order of AVF FRANCHISING, LLC ( "Holder"), as directed by said Holder, the sum of Twenty Five Thousand Dollars ($25,000) (the "Franchise Fee Debt"), at the time and upon the terms set forth below.

The term of this promissory note ("Note") shall be from the date of execution and continue for a period of sixty (60) months thereafter through March 17th, 2018 (the "Due Date"), unless accelerated upon default as provided herein.  Interest at the federal prime rate plus two (2%) per cent shall be charged on any unpaid balance. A final balloon payment of the then remaining unpaid principal balance and all accrued interest thereon, if any, shall be paid on or before the Due Date.

All payments on this Note are to be made or given to the Holder, whose address for this purpose is 6500 E. 14 Mile Road, Warren, Michigan 48092, or to such other place as the Holders of this Note may from time to time direct by written notice to Maker.

This Note may be prepaid in whole or in part without prepayment penalty.

Notwithstanding the above, Holder agrees that it shall credit to Maker each year of this Note, and forgive as debt,  the sum of Five Thousand Dollars (**$5**,000), equivalent to twenty per cent (20%) per year of the Franchise Fee Debt, provided that Maker has complied with all of the following conditions: (i) submission to Holder of written proof of initial build out or remodeling expenditures pursuant to Holder's specifications and standards in the minimum amount of $50,000; (ii) Maker remaining current in all obligations owing under the Franchise Agreement; (iii) completion of grand opening within 90 days of opening; and (iv) attendance by the principal owner at all annual conventions. In the event any of these conditions are not met, the balance of the Franchise Fee Debt less credits earned shall be accelerated and immediately due and payable to Holder.

The parties recognize this Note is executed to memorialize initial franchise fee payments owing by Maker as franchisee to Holder as Franchisor pursuant to a franchise agreement executed between the parties of even date herewith (the "Franchise Agreement").  This Note is secured by a certain Security Agreement executed on the even date hereof by Maker, as Debtor, and Holder, as Secured Party ("Security Agreement") that grants Holder a continuing security interest in the assets of Maker as defined therein.

Maker severally waives diligence, presentment, protest and demand and also waives notice of protest, demand, dishonor and nonpayment of this Note, and expressly agrees that this Note or any payment hereunder may be extended from time to time, and consent to the acceptance of further security or release of any security for this Note, all without in any way effecting the liability of Maker. No extension of time for the payment of this Note, or any installment hereof, made by agreement by the Holder hereof with any person now or hereafter liable for the payment of this Note, shall effect the original liability under this Note of Maker, even if Maker are not parties to such agreement. Maker further waives any right to require Holder to proceed against any security pledged to secure the obligations of this Note or to pursue any other remedy Holder may have prior to Holder proceeding directly against Maker.

If Maker consists of more than one person or entity, or if this Note is executed or guaranteed by a guarantor, their obligations hereunder shall be joint and several.

The failure to exercise any of the foregoing options upon the happening of one or more of the foregoing events shall not constitute a waiver of the right to exercise the same or any other option at any subsequent time in respect of the same event or any other event. The acceptance by Holder of any payment hereunder which is less than the payment in full of all amounts due and payable at the time of such payment shall not constitute a waiver of the right to exercise any of the foregoing options at that time or at any subsequent time or nullify any prior exercise of any such option without the express consent of the Holder hereof, except as and to the extent otherwise provided by law.

All amounts payable hereunder shall be payable in lawful money of the United States. Maker agrees to pay all costs of collection when incurred, including reasonable attorneys' fees, and to perform and comply with each of the covenants, conditions, provisions, and agreements contained in every instrument now evidencing or securing said indebtedness.

Any notice, demand, request, consent, approval, or communication that either Holder or Maker are required to give to the other or to any other person shall be in writing and either served personally or sent by registered or certified United States mail, return receipt requested. Holder and Maker may change their address by notifying the other of the change of address in accordance with the provisions of this paragraph. Notice shall be deemed communicated within three (3) business days from the time of deposit in the United States mail, if mailed as provided in this paragraph, or upon personal delivery.

This Note shall be governed by and construed in accordance with the laws of the State of Michigan.

IN WITNESS WHEREOF, the undersigned has executed this Note on the date written above.

**MAKER:** Thomas Allen Lynch and Tamara Ann Lynch,

By: _Thomas Allen Lynch_       By: _Tamara A Lynch_

Its: _____       Its: _____

## APPENDIX E

## SECURITY AGREEMENT

The undersigned, Thomas Allen Lynch and Tamara Ann Lynch, ("Debtor") hereby grants to AVF FRANCHISING, LLC, a Michigan limited liability company located at 6500 E. 14 Mile Road, Warren, Michigan 48092 (the "Secured Party") a security interest in the collateral as hereinafter described and agrees as follows:

1.      **Grant of Security Interest.**  Debtor grants to Secured Party a continuing security interest in  all of the assets of Debtor and all of the other following described property in which Debtor now or hereafter acquires an interest  in whatever form, and in any and all proceeds thereof: the Franchise Agreement between Debtor as franchisee and Secured Party as franchisor of even date herewith and all rights related thereto, inventory, equipment, fixtures, accounts, deposit accounts, goods, documents, letter-of-credit rights, chattel paper, instruments and general intangibles used in connection with Debtor's AVF Franchise business located at Site TBD in Owosso, Michigan (collectively the "Collateral").

2.      **Perfection of Security Interest.**  Debtor hereby authorizes Secured Party to file financing statements and any renewals thereof describing the Collateral for purposes of perfecting the security interest granted in the Collateral to Secured Party hereunder.  Debtor shall make appropriate entries on its books and records disclosing Secured Party's security interests in the collateral.

3.      **Indebtedness Secured.** The foregoing security interest is given to secure payment and performance of all obligations and indebtedness of Debtor now or later owing to Secured Party, under this Security Agreement, the Franchise Agreement and all Promissory Notes executed by Debtor in favor of Secured Party on the even date hereof ("Note(s)") and any other agreements that have been or are in the future signed by Debtor, and all extensions or renewals of the indebtedness and obligations.  This security interest secures all indebtedness and obligations now or later owing to Secured Party by Debtor, regardless of whether any such indebtedness or obligation is: (a) not presently intended or contemplated by Debtor or Secured Party; (b) indirect, contingent, or secondary; (c) unrelated to the Collateral or to any financing of the Collateral by Secured Party; or (d) now or later evidenced by a promissory note or other document that does not refer to this security interest or this agreement.

The indebtedness and obligations that are secured by this security interest are collectively called the "Indebtedness."

4.      **Warranties, Representations and Agreements** Debtor warrants and represents to, and agrees with, Secured Party as follows:  Debtor is an individual/sole proprietor entity, which is organized and validly existing under the laws of the State of Michigan.  Debtor has full power and authority to enter into and perform its obligations under this Security Agreement and the person executing this Security Agreement is authorized to bind Debtor hereunder.

5.    **Agreements of Debtor.**  Debtor hereby agrees to the following:

    a.    Debtor will not cause or permit any lien, security interest or encumbrance to be placed on any Collateral, except in favor of Secured Party and as may be approved by Secured Party.

    b.    Debtor will maintain all records concerning the Collateral at Debtor's place of business.

    c.    Debtor will furnish Secured Party with the information regarding the Collateral that Secured Party shall from time to time request and will allow Secured Party at any reasonable time to inspect the Collateral and Debtor's records regarding the Collateral.

    d.    Debtor will indemnify Secured Party with respect to all losses, damages, liabilities, and expenses (including attorney fees) incurred by Secured Party by reason of any failure of Debtor to comply with any of Debtor's obligations under this Security Agreement or by reason of any warranty or representation made by Debtor to Secured Party in this Security Agreement being false in any material respect.

6.    **Secured Party's Right to Perform.**  If Debtor fails to perform any obligation of Debtor under this Security Agreement within thirty (30) days or such other reasonable time period after written demand is made by Secured Party, Secured Party may, without giving further notice to or obtaining the consent of Debtor, perform that obligation on behalf of Debtor. Debtor will reimburse Secured Party on demand for any expense that Secured Party incurs in performing any such obligation and will pay to Secured Party interest on it, from the date the expense was incurred by Secured Party, at the highest rate to which Debtor could lawfully agree in writing. Secured Party is not required to perform an obligation that Debtor has failed to perform. If Secured Party does so, that will not be a waiver of Secured Party's right to declare the Indebtedness immediately due and payable by reason of Debtor's failure to perform.

7.    **Events of Default and Acceleration.**  Any part or all of the Indebtedness shall, at the option of Secured Party, become immediately due and payable without notice or demand upon the occurrence of any of the following events of default:

    a.    If default occurs in the payment or performance of any of the Indebtedness, when and as it shall be due and payable, including the application of all applicable cure periods.

    b.    If default occurs in the performance of any obligation of Debtor to Secured Party under this Security Agreement, Franchise Agreement, Note(s) or other agreement that now or later secures or relates to any indebtedness or obligation now or later owing by Debtor to Secured Party or that secures or relates to any guaranty of any such indebtedness or obligation ("Security Documents").

      c.       If any warranty, representation or statement made by Debtor to Secured Party regarding all or part of the Indebtedness in this Security Agreement or in any of the Security Documents was false in any material respect when made or furnished.

      d.       If Debtor dissolves, becomes insolvent, or makes an assignment for the benefit of creditors.

      e.       If any guaranty that now or later secures payment or performance of all or any part of the Indebtedness is terminated or limited for any reason, without the written consent or agreement of Secured Party.

      f.       If any attachment, garnishment, levy, execution or other legal process is at any time issued against or placed upon the Collateral.

      g.       If a voluntary or involuntary case in bankruptcy, receivership or insolvency is at any time commenced by or against Debtor, or if any attachment, garnishment, levy, execution, or other legal process is at any time issued against or placed upon any Collateral, then the entire Indebtedness shall automatically become immediately due and payable, without notice or demand. All or part of the Indebtedness also may become, or may be declared to be, immediately due and payable under the terms of any of the Security Documents.

      8.      **Secured Party's Rights and Remedies.**  Secured Party shall have all rights and remedies of a secured party under applicable laws.

      9.      **Expenses.**  Debtor shall reimburse Secured Party on demand for all reasonable attorney fees, legal expenses and other expenses that Secured Party incurs in protecting and enforcing its rights under this Security Agreement.

      10.      **Amendments and Waivers.**  No provision of this Security Agreement may be modified or waived except by a written agreement signed by Secured Party. Secured Party will continue to have all of its rights under this Security Agreement even if it does not fully and promptly exercise them on all occasions. Secured Party is not required to sue upon or otherwise enforce payment of the Indebtedness or any other security before exercising its rights under this Security Agreement.

      11.      **Notices.**  Any notice to Debtor or to Secured Party shall be deemed to be given if and when mailed, with postage prepaid, to the respective registered office or last known address of Debtor or Secured Party, or if and when delivered personally.

      12.      **Applicable Law.**  This Security Agreement shall be governed by and interpreted in accordance with the laws of the State of Michigan.

13.    **Binding Effect.**  This Security Agreement shall be binding upon and inure to the benefit of Debtor and Secured Party and their respective successors, and assigns.

**IN WITNESS WHEREOF**, the Debtor has caused this Security Agreement to be executed on this 18th day of March, 2013.

**DEBTOR:**  Thomas Allen Lynch and Tamara Ann Lynch

By: _____

Its: _____

By: _____

Its: _____

## EXHIBIT D

## JOINT AND SEVERAL UNCONDITIONAL GUARANTY

This Joint and Several Unconditional Guaranty (this "Guaranty") dated as of March 18th, 2013, is made by Thomas Allen Lynch, an individual residing in the State of Michigan and Tamara Ann Lynch, an individual residing in the State of Michigan (and each additional individual whose signature appears at the end of this Guaranty under the heading "Guarantors") (collectively referred to herein as the "Guarantors"), in favor of AVF Franchising, L.L.C., a Michigan limited liability company having its principal place of business at 6500 E. 14 Mile Road, Warren, Michigan 48092 ("AVF"), and executed and delivered as of the date of that certain AVF Franchise Agreement  between AVF as Franchisor and  Thomas Allen Lynch and Tamara Ann Lynch, a(n) individual, having a business address of  Site TBD in Owosso, Michigan (referred to herein as "Franchisee") dated March 18th, 2013 (the "Franchise Agreement").

---

### RECITALS:

A.  Franchisee and AVF are prepared to execute and deliver the Franchise Agreement, and, as an inducement to AVF to enter into the Franchise Agreement, each of the Guarantors has agreed to guarantee the performance of all obligations of Franchisee as provided by the Franchise Agreement and any other agreements (the "Other Agreements") executed between Franchisee and AVF now or in the future (collectively, the "Obligations") and to execute and deliver this Guaranty; and

B.  Each Guarantor, individually, will directly benefit from the agreement by AVF to enter into the Franchise Agreement and any Other Agreements with Franchisee;

NOW, THEREFORE, in consideration of the foregoing, the execution of the Franchise Agreement and Other Agreements and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, and intending to be legally bound, the Guarantors, and each of them, agree as follows:

**Section 1: Statement of Guaranty**  The Guarantors, and each of them, jointly and severally, unconditionally, absolutely and irrevocably guarantee prompt and satisfactory performance of the Obligations provided by the Franchise Agreement and Other Agreements in accordance with all its terms and conditions, and all renewals, extensions, modifications and amendments of the Franchise Agreement.   If Franchisee defaults in performance of its Obligations under the Franchise Agreement according to its terms and conditions, the Guarantors, and each of them, jointly and severally, irrevocably and unconditionally agree that they are each liable to AVF as primary obligors for the full payment and performance of the Obligations and all damages, costs, and expenses that AVF is entitled to recover from Franchisee by reason of such default.

**Section 2: Payment**  The Guarantors, and each of them, jointly and severally, agree that, if any of the Obligations requiring payment to AVF of sums of money are not punctually paid to AVF when such amounts are due according to the terms of the Franchise Agreement and/or the Other Agreements, the Guarantors, and each of them, shall, immediately upon demand by AVF and without any other notice whatsoever, pay the amount due to AVF at the address listed in the Franchise Agreement or at such other address as AVF may notify the Guarantors in writing.  It shall not be necessary for AVF, and AVF shall not be required in order to enforce such payment by any of the Guarantors, first to institute suit or exhaust its remedies against Franchisee or others liable for such amount. AVF shall not be required to mitigate damages or take any other action to reduce, collect or enforce the Obligations.  No setoff, counterclaim, reduction or diminution of any Obligation, or any defense of any kind or nature that any of the Guarantors has or may have against Franchisee or AVF shall be available under this Guaranty to such Guarantor. No payment by any of the Guarantors shall discharge the liability of such Guarantor hereunder until all Obligations have been satisfied in full.

**Section 3: Duration and Requirement to Keep Contact Information Current**  This Guaranty shall continue in force until all Obligations under the Franchise Agreement and the Other Agreements have been satisfied or until Franchisee's liability to AVF under the Franchise Agreement has been completely discharged, whichever occurs first.  The Guarantors, and each of them, agree to provide written updated contact information to AVF within thirty (30) days of any change.  The Guarantors, and each of them, shall not be discharged from liability under the Guaranty as long as any claim by AVF against Franchisee remains outstanding.

**Section 4: Joint and Several Liability**  The Guarantors, and each of them, shall be jointly and severally liable for all Obligations under this Guaranty.  This Guaranty may be enforced against any of the Guarantors separately or against all Guarantors jointly.

**Section 5: Waivers and Consents**  The Guarantors, and each of them, hereby:  (a) assent to all terms and agreements made by Franchisee with AVF either before or after the date of this Guaranty; and (b) consent that AVF may without in any manner impairing its rights or the obligations of the Guarantors hereunder:  (1) waive or delay the exercise of its rights or remedies against Franchisee or any other person or entity, including, without limitation, any of the Guarantors; (2) release Franchisee or any other person or entity, including, without limitation, any of the Guarantors; (3) make, grant or give any adjustment, indulgence, forbearance or compromise to Franchisee or to any of the Guarantors; (4) renew, extend or modify the terms of, or increase, any of the Obligations or any agreement evidencing the same; and (5) apply payments by Franchisee, the Guarantors, or any other person or entity to any of the Obligations.

**Section 6: Notices**  The Guarantors, and each of them, hereby waive all notices whatsoever with respect to this Guaranty or with respect to the Obligations, including, but without limitation, notice of:  (a) AVF's acceptance of this Guaranty or its intention to act, or its action, in reliance hereon; (b) the present existence or future incurring of any of the Obligations or any terms or amounts of the Obligations or any change therein; (c) any default by Franchisee or any surety, pledgor, grantor of security, or guarantor, including, without limitation, any of the Guarantors; and (d) the obtaining or release of any guaranty or surety agreement  (in addition to this Guaranty), pledge, assignment, or other security for all or any part of the Obligations.

2

**Section 7: Benefit**  This Guaranty shall inure to the benefit of AVF, its successors and assigns, and to any person to whom AVF may grant an interest in any of the Obligations, and shall be binding upon the Guarantors and their respective successors, assigns, heirs, executors, administrators and legal representatives.

IN WITNESS WHEREOF, the Guarantors, and each of them, intending to be jointly and severally legally bound hereby, have caused this Guaranty to be executed as of the date and year first above written.

(Signature): _Thomas Allen Lynch_
Name Printed: _Thomas Allen Lynch_
Address: _8114 Stanley Rd._
_Flushing Mi 48433_
Telephone: _810-659-1401_
Primary Email: _Tom@SchneiderAppliance.com_

(Signature): _Tamara A Lynch_
Name Printed: _Tamara A. Lynch_
Address: _8114 Stanley Rd_
_Flushing Mi 48433_
Telephone: _810 659 1401_
Primary Email: _lynch81@comcast.net_

3

## EXHIBIT E

## CONFIDENTIALITY AND
## NON-SOLICITATION AGREEMENT

## (OFFICER/DIRECTOR/MEMBER/SHAREHOLDER)

This Confidentiality, Non-Solicitation and Non-Competition Agreement (referred to as this "Confidentiality Agreement") is made and entered into this 18th day of March, 2013, by and among AVF Franchising, L.L.C., a Michigan limited liability company with its principal place of business located at 6500 E. 14 Mile Road, Warren, Michigan 48092 ("AVF" or "Franchisor"), and Thomas Allen Lynch ("Individual"), and Tamara Ann Lynch with their principal place of business located at a Site TBD in Owosso, Michigan (hereinafter, "Franchisee").

### RECITALS:

A)  Franchisor and Franchisee have entered into that certain AVF Franchise Agreement dated March 18th, 2013 and incorporated herein by this reference to that Agreement (the "Franchise Agreement").

B)  Individual, in the course of performance of his or her responsibilities to Franchisee, or as a result of his or her business or official relationship with or for Franchisee, will be provided the confidential and proprietary information of AVF relating to operation of a business that will market and sell mattresses, pillows, protectors and related items (the "AVF  System").

C)  Individual and Franchisee acknowledge the need for confidentiality of the confidential and proprietary information and AVF System and agree that full compliance with the terms of this Confidentiality Agreement is necessary to protect such confidentiality.

D)  The Franchise Agreement provides that the officers, directors, members and shareholders of Franchisee shall be required to sign a confidentiality agreement with AVF in form satisfactory to Franchisor.

E)  Individual will receive benefits by virtue of the grant of the franchise by Franchisor to Franchisee.

### AGREEMENT

Now therefore, in consideration of the covenants herein contained, it is agreed:

1.      Capitalized Terms.  All capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Franchise Agreement.

2.    Confidential and Proprietary Information.  Individual shall not, during the term of this Confidentiality Agreement or the Franchise Agreement or anytime after the expiration or termination of the Franchise Agreement or this Confidentiality Agreement use, except in its AVF business licensed under the Franchise Agreement; or communicate, divulge, or use for the benefit of any other person, any Confidential Information (as defined below), knowledge, or know-how concerning the AVF System or the methods of operation under the AVF  System which may be communicated to Individual, or of which Individual may be apprised, by virtue of Individual's position in  Franchisee's business operations.

"Confidential Information" means all of Franchisor's financial, technical, operational, business, manuals, marketing, advertising, supplier, management and other information disclosed to Individual under the Franchise Agreement or as part of the AVF  System.

Notwithstanding anything contained herein, Confidential Information shall not include any information:

(a)    which, at the date of disclosure to the recipient or its authorized representative, is in the public domain or which, after such disclosure, comes within the public domain through no fault of the party to which it is disclosed or its authorized representative;

(b)    which was known to the party to which it was disclosed under this Confidentiality Agreement, before the effectiveness of the Franchise Agreement or any other agreement with Franchisor;

(c)    the disclosure of which is required by law or by any competent regulatory authority; or

(d)    which at any time comes independently and lawfully into the possession of the recipient, either from its own resources or from any third party.

3.    Individual Work Product.  Individual hereby grants to Franchisor a nonexclusive royalty-free license to use in its AVF franchise and to sublicense the right to use in its Franchisee's AVF franchise business and any and all inventions, enhancements, processes, methods, designs and other creations (hereinafter, "Developments") that, during the term of this Confidentiality Agreement, Individual may develop, invent, discover, conceive or originate, alone or in conjunction with any other person, which Developments relate in any way to Individual's involvement in the operation of Franchisee's AVF business.

4.    Remedies for Breach of Agreement.  In the event of the breach or threatened breach of this Confidentiality Agreement by Individual, each of Franchisee and Franchisor shall be entitled to injunctions, both preliminary and final, enjoining and restraining such breach or threatened breach and to recover for the benefit of Franchisor, by means of an accounting, any profits

Individual may obtain in violation of this Confidentiality Agreement. Such remedies shall be in addition to all of the remedies available at law or in equity. The prevailing party shall also be entitled to recover its attorneys' fees and expenses in any successful action to enforce this Confidentiality Agreement.

5.      Covenant Not to Solicit Clients and Employees. Individual acknowledges that Franchisor has a proprietary interest in the goodwill established by Individual's contacts with Franchisee's clients and accounts. Therefore, Individual specifically agrees that, during the period of his or her relationship with Franchisee and for a period of twenty-four (24) months following the termination of such relationship with Franchisee for any reason, Individual shall not directly or indirectly, on behalf of himself or herself or any competing organization, as to competing products or services, solicit any of Franchisee's clients for whom Individual performed services while an officer, director, member or shareholder of Franchisee or which Individual solicited on behalf of Franchisee.

Individual also agrees that, during the period of his or her relationship with Franchisee and for a period of twenty-four (24) months after the termination of such relationship for any reason, he or she will not attempt to hire, engage or employ, or solicit, contact or communicate with, for the purpose of hiring, employing or engaging any person who is then an employee of Franchisee or Franchisor, or who was an employee of Franchisee or Franchisor at any time within the twenty-four (24) month period immediately prior to such termination.

Individual acknowledges that the restricted period of time and customer limitation specified herein are reasonable in view of the nature of the business in which Franchisee and Franchisor are engaged and Individual's knowledge of Franchisee's and Franchisor's operations. If the scope of any stated restriction is too broad to permit enforcement of such restriction to its full extent, then such restriction shall be enforced to the maximum extent permitted by law.

This covenant shall not affect any non-competition provision set forth in the franchise agreement or any other agreement with Franchisor, but shall be in addition to the terms of such covenant.

6.      Injunctive Relief. Individual understands and agrees that the damages which Franchisee or Franchisor may suffer from Individual's violation of any of Individual's obligations pursuant to this Confidentiality Agreement would be difficult or impossible to measure and that either Franchisee or Franchisor, or both, is entitled to injunctive relief for any violation, plus damages in an amount equal to the profits of Individual gained by or from such violation.

7.      Binding Effect. This Confidentiality Agreement shall be binding upon the parties to this Confidentiality Agreement and upon their respective executors, administrators, legal representatives, successors and assigns.

8.      Applicable Law. This Confidentiality Agreement shall be governed by and construed under the internal laws of the State of Michigan, without application of its conflicts of laws provisions. If any provision of this Confidentiality Agreement is declared void, such provision shall be deemed severed from this Confidentiality Agreement, which shall otherwise remain in full force and effect.

3

9.    Entire Agreement.  This Confidentiality Agreement constitutes the entire agreement between the parties with respect to the subject matter of this Confidentiality Agreement, and no modifications or revisions of this Confidentiality Agreement shall have any force and effect, unless the same are in writing and executed by the parties to this Confidentiality Agreement.

10.    Notices.  Any notices required or permitted to be given under this Confidentiality Agreement shall be in writing, and sent by certified mail to the last known residential address in the case of Individual, or to its principal office in the case of Franchisee or Franchisor.

11.    Construction of Agreement.  The parties hereby confirm and agree that this Confidentiality Agreement is the result of negotiation and compromise, and that in interpreting this Confidentiality Agreement neither party shall be considered to be the drafter of this Confidentiality Agreement, and that the language should not be strictly construed against either party, but rather this Confidentiality Agreement shall be interpreted consistent with the ordinary and reasonable meaning of the words used herein.

IN WITNESS WHEREOF, the parties to this Confidentiality Agreement have executed this Confidentiality Agreement as of the day and year first above written.

**AVF FRANCHISING, L.L.C.**

By: _____

Name Printed: _____David Braun_____

Title: _____Director_____

**FRANCHISEE:** Thomas Allen Lynch and Tamara Ann Lynch

By: _____

Name Printed: _Thomas Allen Lynch._

Title: _____

By: _Tamara A Lynch_____

Name Printed: _Tamara A. Lynch_____

Title: _____

## EXHIBIT F

## ASSIGNMENT OF TELEPHONE SERVICE AGREEMENT

Date: 3-18-13

This assignment is effective as of the date of termination or expiration of the AVF Franchise Agreement (the "Franchise Agreement") entered into between AVF Franchising, LLC ("AVF") and Thomas Allen Lynch and Tamara Ann Lynch ("Franchisee"). Franchisee irrevocably assigns to AVF or its designee the telephone number or numbers and listings, including cell phone numbers issued (or issued in the future) to Franchisee with respect to each and all of Franchisee's AVF businesses ("Telephone Numbers"). This assignment is for collateral purposes only, and AVF has no liability or obligation of any kind whatsoever arising from this assignment, unless ACF desires to take possession and control over the Telephone Numbers.

AVF is authorized and empowered upon termination or expiration of the Franchise Agreement and without any further notice to Franchisee to notify the telephone company, as well as any other company that publishes telephone directories ("Telephone Companies"), to transfer the Telephone Numbers to AVF or such other person or entity as AVF designates. Franchisee grants to Pure Sleep an irrevocable power of attorney and appoints AVF as Franchisee's attorney-in-fact to take any necessary actions to assign the Telephone Numbers, including but not limited to, executing any forms that the Telephone Companies may require to effectuate the assignment. This assignment is also for the benefit of the Telephone Companies, and the Telephone Companies may accept this assignment and AVF's instructions as conclusive evidence of its rights in the Telephone Numbers and its authority to direct the amendment, termination or transfer of the Telephone Numbers, as if they had originally been issued to AVF. In addition, Franchisee agrees to hold the Telephone Companies harmless from any and all claims against them arising out of any actions or instructions by Pure Sleep regarding the Telephone Numbers.

FRANCHISEE:                                    AVF FRANCHISING, LLC:
Thomas Allen Lynch and Tamara Ann Lynch

By: _____              By: _____

Its: _____             Its: _____

By: _____

Its: _____


Notary for Franchisee's Signature

Subscribed and sworn to before me
this 18th day of March , 20 13 .

_____
Notary Public

_____ County,

Acting in _____ County, _____
My Commission expires: _____

BARBARA J. VANJAARSVELD
Notary Public, State of Michigan
County of Macomb
My Commission Expires Apr. 19, 2014
Acting in the County of MACOMB

**EXHIBIT I**

**ACKNOWLEDGMENT ADDENDUM**

**(Acknowledgment Addendum to
AVF FRANCHISING, L.L.C. Franchise Agreement)**

As you know, you and we are entering into a Franchise Agreement for the operation of an AVF franchise.    The purpose of this Acknowledgment Addendum is to determine whether any statements or promises were made to you that we have not authorized or that may be untrue, inaccurate or misleading, and to be certain that you understand the limitations on claims that may be made by you by reason of the offer and sale of the franchise and operation of your business. Please review each of the following questions carefully and provide honest responses to each question.

**Acknowledgments and Representations.***

1.      Did you receive a copy of our Franchise Disclosure Document (and all exhibits and attachments) at least fourteen calendar days prior to signing the Franchise Agreement?
Check one: (X) Yes (_) No.  If no, please comment: _____
_____

2.      Have you studied and reviewed carefully our Franchise Disclosure Document and Franchise Agreement?
Check one: (X) Yes (_) No.  If no, please comment: _____
_____

3.      Did you receive a copy of the Franchise Agreement at least seven (7) calendar days prior to the date on which the Franchise Agreement was executed?
Check one: (X) No (_) Yes.  If no, please comment: _____
_____

4.      Did you understand all the information contained in both the Franchise Disclosure Document and Franchise Agreement?
Check one: (X) Yes (_) No.  If no, please comment: _____
_____

5.  Was any oral, written or visual claim or representation made to you which contradicted the disclosures in the Disclosure Document?
    Check one: (ᵥ) No ( ) Yes. If yes, please state in detail the oral, written or visual claim or representation: _____

    _____

6.  Did any employee or other person speaking on behalf of Franchisor make any oral, written or visual claim, statement, promise or representation to you that stated, suggested, predicted or projected sales, revenues, expenses, earnings, income or profit levels at any AVF, location or business, or the likelihood of success in your AVF business?
    Check one: (ᵥ) No ( ) Yes. If yes, please state in detail the oral, written or visual claim or representation: _____

    _____

7.  Did any employee or other person speaking on behalf of Franchisor make any statement or promise regarding the costs involved in operating a franchise that is not contained in the Franchise Disclosure Document or that is contrary to, or different from, the information contained in the Franchise Disclosure Document.
    Check one: ( ) Yes (✗) No. If no, please comment: _____

    _____

8.  Do you understand that the franchise granted is for the right to operate a AVF Franchise business in the Franchised Area only and that we have the right, subject only to the limited rights granted to you under the Franchise Agreement, to issue franchises or operate competing businesses for or at locations, as determined by us, near your Franchised Area?
    Check one: (✗) Yes ( ) No. If no, please comment: _____

    _____

9.  Do you understand that the Franchise Agreement contains the entire agreement between you and us concerning your AVF business, meaning that any prior oral or written statements not set out in the Franchise Agreement will not be binding?
    Check one: (✗) Yes ( ) No. If no, please comment: _____

    _____

10. Do you understand that the success or failure of your AVF business will depend in large part upon your skills and experience, your business acumen, the location of your Franchised Area, the local market for products and services provided under the AVF trademarks, interest rates, the economy, inflation, the number of employees you hire and their compensation, competition and other economic and business factors? Further, do

you understand that the economic and business factors that exist at the time you open your AVF business may change?

Check one: (✓) Yes ( ) No.  If no, please comment: _____

_____

YOU UNDERSTAND THAT YOUR ANSWERS ARE IMPORTANT TO US AND THAT WE WILL RELY ON THEM.  BY SIGNING THIS ADDENDUM, YOU ARE REPRESENTING THAT YOU HAVE CONSIDERED EACH QUESTION CAREFULLY AND RESPONDED TRUTHFULLY TO THE ABOVE QUESTIONS.  IF MORE SPACE IS NEEDED FOR ANY ANSWER, CONTINUE ON A SEPARATE SHEET AND ATTACH.

**NOTE:  IF THE RECIPIENT IS A CORPORATION, PARTNERSHIP, LIMITED LIABILITY COMPANY OR OTHER ENTITY, EACH OF ITS PRINCIPAL OWNER AND MINORITY OWNERS MUST EXECUTE THIS ACKNOWLEDGMENT.**

FRANCHISEE:

APPROVED ON BEHALF OF AVF FRANCHISING, L.L.C.


Signed: _Thomas Allen Lynch_   Signed: _____
Print Name: _Thomas Allen Lynch_   Print Name: _David Brown_
Date: _3-18-13_   Date: _3-18-13_
Signed: _Tamara A Lynch_
Print Name: _Tamara A. Lynch_
Date: _3.18.13_


*Such representations are not intended to nor shall they act as a release, estoppel or waiver of any liability incurred under the Maryland Franchise Registration and Disclosure Law.

3